Charles Lee MASON, Appellant,

v.

UNITED STATES of America, Appellee.

No. 19077.

United States Court of Appeals Eighth Circuit.

Nov. 4, 1968.

J. Arnot Hill, of the Legal Aid and Defender Society, Kansas City, Mo., for appellant; John J. Cosgrove, Kansas City, Mo., was with J. Arnot Hill, Kansas City, Mo., on the brief.

Vernon A. Poschel, Asst. U. S. Atty., Kansas City, Mo., for appellee; Calvin K. Hamilton, U. S. Atty., was with Vernon A. Poschel, Kansas City, Mo., on the brief.

Before VAN OOSTERHOUT, Chief Judge, and GIBSON and BRIGHT, Circuit Judges.

GIBSON, Circuit Judge.

The defendant Charles L. Mason appeals from a judgment of conviction entered in the United States District Court for the Western District of Missouri on a jury verdict of guilty of attempting by intimidation to take funds in the possession of a bank, the deposits of which were insured by the FDIC, in violation of 18 U.S.C. § 2113(a). Mason was sentenced to five years imprisonment under 18 U.S.C. § 4208(a) (2). A timely appeal was taken. Mason does not deny the act charged but claims the government failed to prove him mentally competent to be answerable for the crime.

On October 14, 1966, at about 4:10 p. m., Mason entered the Tower Banking Center of the Commerce Trust Company, Kansas City, Missouri, went to a writing counter and composed a note on a deposit slip.[1] He then approached a teller window and handed the note to teller Ann Hudson, who was speaking on the telephone. Mrs. Hudson read the note and continued to speak on the telephone while making a hand signal beneath the level of the tellers' counter to guard Thomas Pierce, whom she observed approaching from the vicinity of the vault to her rear. Mason, his right hand tucked in his shirt, said to Mrs. Hudson, "Get off that 'phone or I will kill you." Meanwhile, the teller next to Mrs. Hudson leaned

1. The note reads:
"If you sound alarm you die. Miss, I have a gun in my shirt. If you want to live, count me out 500.00 five hundred dollars in small dollars. Leave me 10 minutes to leave in car. I shall first customer to leave.

"[signed] Martin

"I mean business."

over and glanced at the note, just as the guard came up. The teller handed the note to the guard who immediately proceeded around the tellers' counter and grabbed Mason's arms from behind. Mason's attention had been directed to Mrs. Hudson and he was surprised by the guard's action in apprehending him from the rear.

The guard pulled Mason away from the tellers' counter and took him a short distance to a room where officers of the Bank conduct public business. For the first and only time Mason put up a show of resistance by twisting his upper body. The guard quickly subdued Mason, seated him in a chair, and searched him. Mason was not armed. Pierce then spoke to Mason for the first time asking him, "What in the world made you do a thing like this?" Mason replied, "I must be crazy." Police officers then appeared and Officer Jaco took charge of Mason by handcuffing him and escorting him to a police car. Two FBI Agents, Harmon and Curran, joined Officer Jaco in the police car, advised Mason of his constitutional rights, and the four made the three-minute ride to the police station.

Only one issue is raised by Mason on appeal. He contends that the District Court erred in overruling his motion for a directed judgment of acquittal at the close of all the evidence, as his criminal responsibility at the time of the crime was not proved beyond a reasonable doubt. In an attempt to establish a lack of criminal responsibility in the trial court, the defense called four witnesses who testified as to Mason's mental condition on October 14, 1966: the defendant Mason; Thomas Pierce, the Bank guard; Dr. August Kinzel of the United States Medical Center for Federal Prisoners at Springfield, Missouri; and Dr. Richard Childs, a psychiatrist in private practice.

Mason testified that after his discharge from the armed forces in 1945 he began drinking heavily and in time became addicted to alcohol, resulting in frequent unemployment and hospitalization in psychiatric wards some 25 to 30 times. For the past seven years he has been taking Desbutal and he has also used Doriden. Prescriptions for these barbiturates, which were refillable at several drug stores, were introduced. Mason recalled three suicide attempts in the past several years, one about a week before the robbery attempt. Four or five days before the robbery attempt, he fell down the stairs at his hotel; he was drinking and taking drugs at the time. On October 11, 1966, three days before the robbery attempt, he procured 180 Librium capsules at the Psychiatric Receiving Center where he was being treated as an out-patient. The morning of October 14, 1966, he thought he had taken all of the drugs in his possession, taking the last of his supply one or two days before; his last drink prior to the robbery attempt was the evening of October 13. Sometime between 10:00 a. m. and 12:00 noon on October 14, Mason telephoned his place of employment and learned of his discharge. He had about 25 or 30 cents in his possession. Mason claimed his memory of the robbery attempt was fragmented—he did not remember entering the Bank, but remembered writing a note and handing it to a woman. He felt that what he was doing was wrong, but he could not stop. He remembered that he had denied taking barbiturates when he was asked if he took them by FBI Agent Curran; he explained that a sense of shame had motivated his denial.

Dr. Kinzel first saw Mason on November 23, 1966, some five weeks after the robbery attempt, and examined Mason on four occasions from that date to March 2, 1967; total time spent with Mason was about three and one-half hours. Dr. Kinzel's diagnosis of Mason was that he suffered a "psychotic depressive reaction" and "acute brain syndrome," and that Mason had been psychotic for the past six or seven years, his condition being most severe in the year immediately preceding the attempted robbery. Dr. Kinzel was of the opin-

## Page 735

---

ion that Mason was largely unaware of what he was doing, was not capable of knowing what he was doing, and was unable to control his actions at the time of the robbery attempt. Dr. Kinzel's diagnosis and opinion were based primarily upon information provided by Mason himself as to his alcohol and drug problems and his lack of memory of the events of October 14, 1966; also considered were the robbery note and facts obtained from a pre-sentence report and a report from a V. A. hospital.

Dr. Childs saw Mason for about 90 minutes on May 5, 1967, seven months after the robbery attempt and three days before the trial commenced. Dr. Childs' diagnosis and opinion concurred in that rendered by Dr. Kinzel. Dr. Childs relied solely on what was related to him by Mason in reaching his conclusions.

The Bank guard, Pierce, told of his taking Mason by surprise, Mason's lack of resistance, and the brief conversation he had with Mason. On cross-examination, Pierce said Mason appeared to be alert, walked steadily, spoke without slurring, the appearance of his eyes was not red, watery or glazed, and no odor of alcohol was detected. Pierce stated that he had considerable experience in the Bank during the past seven years with persons under the influence of drugs or alcohol and, in his opinion, Mason did not appear to be under the influence of either.

The government introduced the testimony of 11 lay witnesses and two psychiatrists to show that Mason was legally sane at the time of the commission of the offense. The lay witnesses all had occasion to observe and talk with Mason for a period of time on the day of the attempted robbery, or on the morning following.

James Wilson, Mason's immediate supervisor at his place of employment, was called by Mason between 10:00 a. m. and 12:00 noon on October 14, and upon inquiry told Mason that he no longer had a job. Mason told Wilson, "I don't know what I am going to do. I need the job bad." Wilson stated that Mason's voice sounded normal, as compared with other telephone conversations with Mason, and as contrasted with a telephone conversation when Wilson suspected Mason had been drinking.

Teller Ann Hudson testified that Mason did not appear to be confused or sleepy, his eyes were not blood shot, or dilated and he had no difficulty focusing, his walk was normal, and he did not smell of alcohol.[2] Jim Fitzgerald, an assistant cashier at the Bank, observed Mason for 10 to 15 minutes following the robbery attempt and stated that Mason did not appear to be confused or sleepy, sat erectly in a chair and did not stagger when he walked.

Officers Jaco, Klein, and Hockett of the Kansas City, Missouri Police Department, and Special Agents Harmon and Curran of the FBI all saw and talked with Mason immediately following the robbery attempt. To them, Mason's answers to questions were responsive, he did not appear to be sleepy or confused, and he gave no indication of having trouble remembering. His speech was deliberate but not slurred. He walked erectly without hesitation, and he had no trouble keeping his balance and did not require assistance when he got out of the police car at the station, even though his hands were handcuffed behind him. Officer Klein was in the courtroom during Mason's testimony and observed that Mason's appearance and actions, his demeanor and manner of speech were the same as when Mason was being interviewed immediately after the attempted robbery.

United States Deputy Marshal Guthridge, United States Commissioner Cisel and Assistant United States Attorney

---

2. Agent Rose of the FBI testified that he interrogated Mrs. Hudson shortly after the robbery attempt, and Mrs. Hudson said, "I thought the man was disturbed in some way." and "The man said he was desperate." On cross-examination, Mrs. Hudson denied telling Rose that she thought Mason to be mentally sick and denied that Mason said, "I am desperate." to her.

Wiggins testified as to their observations of Mason on the morning of October 15, 1966, at the hearing before the Commissioner. Their testimony was the same as the other lay witnesses with regard to Mason's appearance, speech and demeanor. Guthridge remembered Mason as crying at times; Wiggins and Cisel did not. Guthridge later returned Mason from the Federal Medical Center and observed that Mason seemed more extroverted and "rational" than at the hearing.

Dr. Edward Rinck is Clinical Director of the State Hospital at Nevada, Missouri, where Mason was admitted on February 22, 1962 for treatment of alcoholism. Dr. Rinck saw and treated Mason on numerous occasions at his initial admission and subsequent admissions in intervening years until Mason transferred to the V. A. Hospital at Wadsworth in January 1966. Dr. Rinck's diagnosis of Mason was "sociopathic personality, alcholism addiction." In Dr. Rinck's opinion, Mason was never found to be psychotic—that is, not in contact with reality—except on one occasion when he had delirium tremens.[3] Dr. Rinck believed that in order to give a valid diagnosis of a person's mental condition at the time of an offense a psychiatrist would need to see him immediately before and after the commission of the offense—otherwise any opinion would be only an educated guess.

Dr. Robert Jones, a resident psychiatrist at the Psychiatric Receiving Center since July 1, 1966, first saw Mason on July 21, 1966, when he was admitted with delirium tremens and continued to see and treat Mason on a daily basis through August 17, 1966. Dr. Jones' diagnosis of Mason was "depressive reaction and alcoholism." Dr. Jones saw Mason on an outpatient basis on August 23, September 27 and October 11, 1966, the last date just three days before the robbery attempt. Dr. Jones was of the opinion that as of October 11, Mason could control his actions (except for his disposition toward alcohol) and would know if an act he committed was wrong, as Mason was in contact with reality and gave no sign of delusional thinking. As was Dr. Rinck, Dr. Jones was of the opinion that an attempt to diagnose Mason's mental condition on October 14, 1966, would be speculative without an opportunity to observe him on that date.

The crux of Mason's argument is that the testimony of the two psychiatrists for the defense, that Mason was incapable of understanding the nature of his criminal act at the time of its commission, stood uncontradicted and commanded a directed judgment of acquittal. Mason points to the testimony of the two psychiatrists for the government and the fact that neither expressly stated an opinion that Mason was capable of understanding the nature of his act at the time of its commission. Mason contends that lay witnesses for the government did not, and could not, express a conclusion as to his mental condition at the time of the event and that except for Wilson, Mason's superior at his place of work, none of the lay witnesses had ever seen him before the day of the crime; hence, their testimony is without value in determining Mason's criminal responsibility. McKenzie v. United States, 266 F.2d 524 (10 Cir. 1959).[4]

■ The government acknowledges it had the obligation to prove Mason's criminal responsibility at the time of the commission of the offense once the issue of insanity had been placed before the trial court. Kaufman v. United States, 350 F.2d 408, 409–410 (8 Cir. 1965),

---

3. Mason stipulated that he was not suffering from delirium tremens at the time of the attempted robbery.

4. In *McKenzie* it is stated at 527 of 266 F.2d:
 "The substance of the evidence adduced by these [non-expert] witnesses was that they observed nothing unusual or abnormal about the defendant immediately before and after the alleged crime. This type of evidence has value only when the witness has had a prolonged and frequent opportunity to observe the subject."

cert. denied 383 U.S. 951, 86 S.Ct. 1211, 16 L.Ed.2d 212.

We believe that the government offered substantial evidence from which the jury could find beyond a reasonable doubt that Mason had the requisite criminal responsibility at the time of the attempted robbery.

 An excellent analysis of controlling principles is found in Mims v. United States, 375 F.2d 135, 143–144 (5 Cir. 1967):

"The sound rule is that the issue of insanity, when raised as a defense in a criminal case, should be determined by the jury from all the evidence, rather than from the opinions of experts alone, subject to the control that the court may always set aside an unreasonable verdict. The real value of expert testimony in these cases is 'in the explanation of the disease and its dynamics, that is, how it occurred, developed, and affected the mental and emotional processes of the defendant; it does not lie in [the] mere expression of conclusion.' However, even though expert opinion evidence is generally advisory in nature, it cannot be arbitrarily ignored.

" * * * [I]n cases involving opinions of medical experts, the probative force of that character of testimony is lessened where it is predicated on subjective symptoms, or where it is based on narrative statements to the expert as to past events not in evidence at the trial. In some cases, the cross-examination of the expert may be such as to justify the trier of facts in not being convinced by him. * * * [D]epending on the particular facts of each case, [these factors may] make a jury issue as to the credibility and weight to be given to the expert testimony; and in determining whether such issue is raised, due consideration must be given to the fact that the trier of facts has the opportunity to observe the witness if he testifies in person."

In light of these fundamental principles, Mason's argument that the testimony offered in his behalf was conclusive is not well taken. While Mason's experts were certainly entitled to express opinions as to his criminal responsibility, their opinions were not binding on the jury. Their diagnoses that Mason was psychotic (after a cumulative five interviews totaling 300 minutes) were largely based on subjective factors supplied by Mason and were contradicted by both Dr. Rinck, who had seen Mason over a six-to-seven year period and was the most experienced psychiatrist who testified, and Dr. Jones,[5] who saw Mason frequently in the weeks immediately prior to the robbery attempt and expressed the opinion that Mason was not psychotic only three days before the robbery attempt. While both Dr. Rinck and Dr. Jones candidly disclaimed the ability to render a diagnosis of an individual's mental condition on a particular day without the opportunity of observing and interviewing that individual on that day, such a disclaimer did not render their opinion evidence "without value" as contended by Mason.

5. Mason seeks to discredit Dr. Jones' ability to express an opinion by characterizing Dr. Jones as " * * * an obviously fledgling psychiatrist * * * who possessed no prior special training or experience in the field * * *." Dusky v. United States, 295 F.2d 743, 755 (8 Cir. 1961), cert. denied 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536. In Kaufman v. United States, supra, at 413 of 350 F.2d, Judge Blackmum, who also authored the Dusky opinon, noted that the term "fledgling psychiatrist" was perhaps an unfortunate choice of words in describing a psychiatrist at the threshold of his career; and Judge Blackmun reiterated what was stated in *Dusky:*

"This and other courts have said that expert opinion as to insanity rises no higher than the reasons upon which it is based, that it is not binding upon the trier of the facts * * *."

We believe that Dr. Jones was entitled to express an opinion as to Mason's mental condition and relate the basis of his opinion to the jury; the jury could take Dr. Jones' limited practical experience in the field into account in evaluating his diagnosis.

Indeed, the real value of expert opinion does not lie in the mere expression of a conclusion, but in the explanation of a mental condition—its onset, development and manifestations. *Mims,* supra. Further, the acknowledgment of Dr. Rinck and Dr. Jones of the limitations of their profession could have been considered by the jury in weighing the opinions of Mason's experts, who formed their opinions some five weeks (Dr. Kinzel) and seven months (Dr. Childs) after the robbery attempt.

In addition, the opinions of the government's experts were based on interviews and examinations of Mason conducted before the robbery attempt; the opinions of defendant's experts were based primarily on narrative statements given by Mason after he was charged with the attempted robbery. The jury could properly consider the interest that Mason had in relating, at a time when a motive to mislead might be present, the subjective symptoms that formed a large part of the factual assumptions on which the defendant's experts' opinions were based.

■ The testimony of the lay witnesses for the government was properly limited to observations gleaned in their contact with Mason. No lay witness stated a conclusion or an opinion as to whether Mason was sane or insane. Their testimony was of probative value in helping the jury determine Mason's criminal responsibility on October 14, 1966. The collective thrust of their testimony indicated that Mason looked and behaved as a person deserving of pity, but possessing the ability to control his actions and to distinguish right from wrong. While the opportunity of lay witnesses to observe Mason was relative-

ly brief, this factor goes to the weight of the evidence, not to its admissibility. See, *Kaufman,* supra, at 415 of 350 F.2d. Lack of an opportunity for prolonged observation can be brought out on cross-examination and argued before the jury. As summarized in 1 Conrad, Modern Trial Evidence § 123, pp. 124–125 (1956):

> "On a plea of insanity in a criminal case, relevant evidence may be interposed to sustain such plea, where intent is an issue. Much latitude is allowed in the admission of such evidence, both on behalf of the state and defendant. \* \* \* The court will allow all evidence relating to mental condition if it has a tendency to throw light on the mental condition of the defendant at the time of the crime for which he is charged.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> "The general rule, sustained by most of the cases, seems to hold that any and all acts, conduct, declarations, spoken words, appearance, and manner of speech on the part of the person involved are relevant \* \* \*."

■ Mason misreads *McKenzie,* supra, for the rule that the observations of lay witnesses are without value unless they have "had a prolonged and frequent opportunity to observe the subject." The Court in *McKenzie* is not talking about lay witnesses testifying to factual observations of conduct, actions, or behavior of a person, but is concerned with lay witnesses testifying to the conclusions of sanity or mental competency.[6] Hence, *McKenzie* is consistent with the recognized general principles that may be succinctly stated as follows: A lay witness can and should relate specific ob-

---

6. The Court in *McKenzie* held at 526–527 of 266 F.2d:

"Before a non-expert witness is competent to testify to the sanity or insanity of another person, he must show an acquaintance of such intimacy and duration as to clearly indicate that his testimony will be of value in determining the issue. The conclusion must be based upon the witness's testimony as to specific in-

stances of behavior or conduct. (Citations omitted)

\*　　\*　　\*　　\*　　\*

"As a general proposition, proper*ally* qualified lay witnesses may testify as to the sanity of an accused, and such testimony may be sufficient to satisfy the burden the law places upon the prosecution even though there is expert testimony to the contrary."

jective observations of a person's conduct, condition or behavior [7] though such a witness may express an opinion on the sanity issue where he has been qualified by sufficient association with and opportunity to observe the subject.[8] The factual evidence adduced from the lay witnesses in this case was properly received.

■ Mason deems himself in a more advantageous position before the law than the defendants in *McKenzie,* supra, and United States v. Westerhausen, 283 F.2d 844 (7 Cir. 1960). The evidence in those cases as we noted in *Dusky,* supra, at 757 of 295 F.2d, "* * * seems so overwhelming in favor of the defense position that we regard as almost inevitable the courts' conclusions that the insanity issue there was not submissible." Accord, *Kaufman,* supra, at 414 of 350 F.2d. The evidence in this case is far from "overwhelming" for the defense. As Judge Blackmun recognized in *Dusky,* supra, at 754 of 295 F.2d:

"* * * the nature and quantum of the evidence which the government must produce to meet its burden so as to justify the submission of the insanity issue * * * varies with the nature and quantum of the evidence indicating mental illness."

The evidence is conflicting at best and the government produced substantial evidence showing Mason mentally competent so as to be answerable for his actions.

*Mason does not question the court's* finding him mentally competent to stand trial. He has never been adjudicated mentally incompetent, though he has been in a number of hospitals because of his alcoholic addiction. He is not a person of limited intelligence and had an indicated I. Q. of 120. The evidence is persuasive that he was oriented as to time and place, and he knowingly and willfully conceived and endeavored to carry out his desperate attempt to secure funds.

His trouble with alcohol addiction and drugs would cause him to be depressed, but this would not necessarily make him a psychotic personality, disoriented in time and place and unaware of his actions and the consequences flowing from his anti-social behavior.

On the evidence adduced at the trial of this case, the trial court properly submitted the issue of Mason's insanity to the jury, and the jury could properly find that the government had proved Mason's criminal responsibility at the time of the attempted robbery beyond a reasonable doubt.

Judgment affirmed.

**7.** II Wigmore, Evidence § 228, p. 9 (3rd ed. 1940); VII Wigmore, supra, § 1958, p. 93; 1 Conrad, supra, § 633, p. 519; 31 Am.Jur.2d, Expert and Opinion Evidence § 85, p. 598 (1967).

**8.** III Wigmore, supra, § 689, p. 9; 1 Conrad, supra, § 641, p. 530; 2 Jones, The Law of Evidence § 409, pp. 769–770 (5th ed. 1958); 31 Am.Jur.2d, supra, § 88, p. 605.