**Richard Curtis APGAR, also Known as James Edwin Hallidy, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 20287.**

United States Court of Appeals, Eighth Circuit.

April 12, 1971.

Joseph P. Stevens, Minot, N. D., for appellant.

Gary Annear, Asst. U. S. Atty., Harold O. Bullis, U. S. Atty., Fargo, N. D., for appellee.

Before VAN OOSTERHOUT and HEANEY, Circuit Judges, and HANSON, District Judge.

HANSON, District Judge.

This is an appeal in forma pauperis from a judgment and sentence based upon a jury verdict finding Richard Curtis Apgar guilty under an information charging him and two co-defendants with armed robbery of a federally insured bank in Velva, North Dakota, in violation of 18 U.S.C., Sections 2113(a)

and (d).[1] Apgar's motion for acquittal made at the close of all the evidence was denied by the District Court.[2] The only issue which we consider on appeal is whether the Government sustained its burden to introduce sufficient evidence on the question of Apgar's sanity to preclude a judgment of acquittal. In addition to this issue raised by defendant's counsel, Apgar (hereafter referred to as defendant) has filed pro se a "Supplemental Brief" raising six additional "Points" which he urges upon us as grounds for reversal. We affirm the conviction.

Apgar and his co-defendants were arrested within two hours of the commission of the crime on the morning of October 11, 1969. At his arraignment on November 4, 1969, Apgar's court-appointed counsel requested that the defendant be examined by a local psychiatrist to determine his competency to stand trial. Pursuant to the District Court's order, the defendant was examined in Grand Forks, North Dakota on November 11, 1969. The District Court subsequently held a hearing pursuant to 18 U.S.C., Section 4244, determined the defendant incompetent to stand trial, and committed him to the custody of the Attorney General pursuant to 18 U.S.C., Section 4246. Defendant was admitted to the Medical Center for Federal Prisoners at Springfield, Missouri, on or about November 19, 1969, and discharged after 75 days on February 2, 1970. A further hearing to determine his competency to stand trial was held in Minot, North Dakota on March 31, 1970, at which time the District Court adjudged Apgar competent to stand trial. The trial commenced on April 14, 1970, and required four days.

## I.

■ At the trial, Apgar admitted his participation in the robbery. His sole defense was his alleged insanity on the day of the crime, and the defense was properly raised. Therefore, the Government was under the necessity of establishing to the satisfaction of the jury beyond a reasonable doubt that defendant's participation was not a result of his insanity. Mason v. United States, 402 F.2d 732, 736–737 (8 Cir. 1968); Dusky v. United States, 295 F.2d 743, 754 (8 Cir. 1961); Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L. Ed. 499 (1895). At the close of all the evidence, the defendant moved for a directed verdict of acquittal which was denied, and the question of sanity was submitted to the jury under instructions which are not challenged here by counsel.[3] Thus, when the defense asserts that the court erred in denying its motion for acquittal, its position necessarily is that the evidence was such that reasonable men must agree that there was reasonable doubt as to Apgar's sanity on October 11, 1969. This Court has entertained a similar question on several occasions. Mason v. United States, supra; Kaufman v. United States, 350 F. 2d 408 (8 Cir. 1965); Dusky v. United States, 271 F.2d 385 (8 Cir. 1959), rev'd on other grounds, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); Dusky v. United States, 295 F.2d 743 (8 Cir. 1961), cert. denied, 368 U.S. 998. 82 S. Ct. 625, 7 L.Ed.2d 536.

The defendant testified in his own behalf. Without detailed elaboration of his lengthy narrative, we feel compelled to say that Richard Apgar's life, particularly since the age of thirteen, demonstrates the tragically inadequate response of our institutions—mental, penal and judicial—to an individual whose acts, time and again, constituted a plea for assistance to overcome severe personal inadequacies. His first serious encounter with the law occurred at the age of fifteen when he was sentenced to

---

1. Apgar's co-defendants were convicted and sentenced separately and are not involved in this appeal.

2. The Honorable George S. Register, Chief Judge.

3. Apgar's pro se "Supplemental Brief" which amounts to a separate appeal does assign as error the District Court's refusal to instruct the jury as requested. We consider that point separately, infra, Part II.

thirty days on a chain gang. At seventeen, he enlisted in the United States Marine Corps, during which service he was absent without leave, apparently attempted suicide, and had his first contact with psychiatric evaluation. After discharge from the service, a marriage and employment ended in failure, and Apgar began cashing forged checks in Ohio during 1962. During the ensuing seven years, defendant appears to have been gainfully employed a total of some nine months, of which six were in conjunction with out-patient treatment at a psychiatric clinic. He was committed to mental institutions in New Jersey and Florida for some twenty-three months where he engaged in several escapes and attempted escapes; he was incarcerated in reformatories for a total of two years and some additional time in local jails awaiting proceedings—during much of which he was confined to maximum security facilities. It is of some interest to note that during defendant's final hospitalization in Florida, he was prescribed medication which continued successfully through six months of out-patient treatment until he was extradited to New Jersey, at which time the medication was discontinued and never resumed. During the remaining time totalling some two and one-half years, Apgar was unable to manage his life within the law and appears to admit to the commission of hundreds of larcenies, burglaries, check forgeries and breaking and entering. These activities culminated in the robbery of the bank at Velva, North Dakota on October 11, 1969. The defendant was then twenty-eight years of age. Following his arrest and incarceration, Apgar attempted to burn the jail in Minot, North Dakota, where he was awaiting proceedings. He was then transferred to Grand Forks where he was examined by a psychiatrist, Dr. B.

E. McLaughlin, on November 11, and subsequently committed to Springfield.

On cross-examination, defendant conceded that on occasion he had considered his occupation to be that of a professional thief, that he had not been employed since November 1968, and that he had lived in Minot for approximately one month prior to the Velva bank robbery. Apgar stated that he and David Poole, another co-defendant, had discussed robbing the bank about one week in advance of actual commission of the crime. On October 10, Apgar and Poole drove to Velva to look over the bank and that same night Apgar drove the road between Velva and Minot several times to "test" it. The defendant further testified that upon making the decision to rob the bank he felt no emotion nor excitement, that he was not nervous during the actual commission of the robbery, and that he had no difficulty remembering the events that occurred in the bank that morning or what happened after he left the bank.

Dr. Alfred Sand, Clinic Director for the North Central Mental Health and Retardation Center at Minot, testified in behalf of defendant. Dr. Sand had conducted a psychiatric evaluation of defendant during the trial. Prior to this examination, he had spent some three hours studying psychiatric reports on Apgar received from the Greystone Hospital in New Jersey; from the University of Florida; from Dr. Grismere at Sand Point, Idaho; from Dr. McLaughlin at Grand Forks, and from the Federal Hospital at Springfield, Missouri. Dr. Sand gave three concurrent diagnoses of defendant: the first two were sociopathic disorders classed respectively as schizoid personality and antisocial personality with the latter being the "main diagnosis."[4] The wit-

---

4. Dr. Sand's testimony emphasizes poignantly the imperfect states of law and medicine:

    "[This] sociopathic disorder, antisocial personality * * * is based on his [defendant's] whole life pattern * * *. He has no conscience of what is right or wrong, and he may go through life, and he will be in prison, and the next day he is out of prison he'll do the same thing that got him into prison. He can't help it. It's a way of life for him * * *. [T]his is the bugaboo of all psychiatrists. The hospitals don't want

ness stated that a person would not be considered to be psychotic as a sociopath, and consequently not insane under present legal standards.

Dr. Sand's third diagnosis was that of "schizophrenia, paranoid type" in remission at the time. of examination. According to defendant's medical records he had previously been determined to be schizophrenic in 1962, meaning that the schizophrenia had developed into psychotic breaks or episodes which would constitute insanity. But Dr. Sand was unable to form any conclusion as to whether defendant was psychotic on October 11, 1969, when the robbery was committed.

Defendant's final witness was one of the arresting officers who testified that at the time of defendant's arrest, Apgar appeared to be talking to non-existent persons and complained of being sick.

The Government in rebuttal presented one expert and two lay witnesses in support of its position that defendant was sane at the time of commission of the offense.

Dr. H. B. Fain, a psychiatrist with the Medical Center at Springfield, Missouri, conducted the initial psychiatric interview of the defendant two days after his admission to the Center on November 19. The evidence is ambiguous as to whether Dr. Fain had any subsequent personal contact with Apgar, but the witness did receive reports later from other institutions and doctors that had formerly evaluated and found the defendant to be actively psychotic.

When asked whether he had an opinion of the psychiatric diagnosis of the defendant as of October 11, 1969, within a degree of medical certainty, Dr. Fain responded:

"Well, in all fairness, I must admit that I did not examine him much at that period, and I take the position somewhat that Dr. Sand takes—that you have to—you certainly should be present to give a valid examination; however, from hearing the testimony, I did see the defendant at an earlier period than Dr. Sand, and I saw no residual—what we mean by 'residuals' —remnants of a thinking disorder or of a psychiatric schizophrenic condition, and from hearing the testimony, I saw no evidence that would lead me to think that he [defendant] was suffering from schizophrenic break at the time, just from hearing the court testimony. That's all I can base it on, and it's just an opinion, because, truthfully, I didn't examine him on the 11th of October, 1969."

Later, when asked what difference existed between his and Dr. Sand's diagnoses, Dr. Fain responded, "It was essentially the same."

Another rebuttal witness, Marvin Okstad, met and visited with defendant on at least four occasions during the week prior to the robbery, as well as once immediately thereafter when Okstad unwittingly loaned defendant his pickup truck as a "getaway" vehicle. Mr. Okstad testified that Apgar acted like anyone else, that the defendant did not appear nervous or excitable, and that his behavior was quite consistent.

A second arresting officer testified that defendant appeared cool and collected during apprehension.

At least one witness presented by the Government in its case-in-chief had also testified that the defendant appeared normal during the robbery. The manager of the Velva bank stated that defendant's speech was clear and understandable, that he gave orders and did not appear nervous.

■ The impact and merits of expert opinion and lay testimony on the issue of a defendant's sanity at the time of a crime have been at issue before this Court in Mason v. United States, *supra*, 402 F.2d at 737–739; Kaufman v. United States, *supra*, 350 F.2d at 413–414;

---

them, the prisons don't want them. * * * [W]e psychiatrists are hoping that someday we will be able to do something for them. But there is no way that we know of now to put a new conscience into this gentleman. * * * *"

Feguer v. United States, 302 F.2d 214, 242 (8 Cir. 1961); Dusky v. United States, 295 F.2d at 747–756, *supra*. The established law within this Circuit is that the issue of insanity, when raised as a defense in a criminal case, should be determined by the jury from all the evidence, rather than from the opinions of experts alone, subject to the control that the court may always set aside an unreasonable verdict. Mason v. United States, *supra;* Feguer v. United States, *supra.* Also see Davis v. United States, *supra.*

■ The testimony of the lay witnesses for the Government was properly limited to observations gleaned from their contact with Apgar, and there is no question as to its admissibility. Mason v. United States, *supra.*

Finally, defendant urges that the cases of Douglas v. United States, 99 U.S. App.D.C. 232, 239 F.2d 52 (1956), and United States v. Westerhausen, 283 F.2d 844 (7th Cir. 1960) compel reversal of the instant case. The courts there determined that on the specific facts of those cases the juries were not warranted in failing to entertain reasonable doubt as to the sanity of the accused.

■ We conclude that the evidence in this case, viewed as a whole, afforded the jury with the choice of finding the defendant to be sane beyond a reasonable doubt and that, therefore, the submission of the insanity issue to the jury was proper.

## II.

Defendant filed pro se a document entitled "Supplemental Brief of Defendant Per [sic] Se", which in reality amounts to a separate appeal alleging six errors to the District Court. Points I and II, while not frivolous on their face, do not appear to have been raised at trial nor otherwise preserved for proper consideration on appeal. Points III and IV are frivolous and merit no consideration. Point V is a repetition of the single point argued by counsel and, accordingly, has been considered. Point VI assigns as error the District Court's refusal to instruct the jury that upon a verdict of not guilty, the defendant might be confined to a hospital, together with a remark in closing argument by the Government implying that upon a verdict of not guilty the defendant would be released to return to past behavior.

■ No objection was entered to the government's argument and any error asserted therein is not preserved. An exception was properly taken to the District Court's refusal to grant an instruction requested by defendant and approved in Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725, 728 (1957), cert. denied 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067. We have previously stated that refusal to grant this instruction is not error. Pope v. United States, 372 F.2d 710, 731 (8 Cir. 1967), vacated 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968); Pope v. United States, 434 F.2d 325 (8 Cir. 1970).

Affirmed.