# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3260

_____

Cecil Clayton,                              *
                                            *
          Appellant,                        *
                                            *   Appeal from the United States
     v.                                     *   District Court for the Western
                                            *   District of Missouri.
Donald P. Roper,                            *
                                            *
          Appellee.                         *

_____

Submitted: October 18, 2007
        Filed: February 1, 2008 (Corrected: 02/21/2008)

_____

Before BYE, BOWMAN, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Cecil Clayton was convicted of first degree murder in the Circuit Court of Jasper County, Missouri, and sentenced to death. After Clayton exhausted his state appeals, he petitioned the appropriate United States district court for a writ of habeas corpus. In his petition Clayton contended that the State of Missouri violated his due process rights at trial, and he requested an evidentiary hearing to determine his present competency to proceed further in the habeas appeal process. Clayton also asserted an actual innocence claim. The district court[1] denied Clayton's request for an evidentiary

_____

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

hearing on his competence and his habeas petition. Clayton appeals each of the court's rulings. We affirm.

## I. *Background*

Clayton is an inmate at a Missouri prison, having been sentenced to death following his conviction on one count of first degree murder for the death of Officer Christopher Castetter.

On November 27, 1996, Clayton met his estranged girlfriend, Martha Ball, at a store in Purdy, Missouri; while at the store, the couple argued loudly. So much so, in fact, that a store employee called police. After a Purdy police officer arrived at the store, Clayton and Ball left but not together. After the store dispute, Clayton went to Ball's mother's house in search of Ball. Concerned, Ball's sister, present at the house, called police and told them that Clayton was trespassing on their property. Officer Castetter responded to the call, and arrived on the scene in a marked patrol car. As Officer Castetter began to roll down his driver's side window, Clayton walked up to the patrol car and shot him in the head at point-blank range. Officer Castetter's car apparently struck Clayton's truck before striking a tree. Officer Castetter later died from the gunshot wound at a local hospital.

After the shooting, Clayton visited his friend, Martin Cole. The two rode in Clayton's truck from Cole's house to Clayton's house. Clayton told Cole that he had shot a policeman. Clayton described the murder to Cole in detail, including the weapon that was used. Clayton told Cole that he wanted Cole to be his alibi witness and threatened to kill Cole if he did not cooperate. The police came to Clayton's home, identified themselves, and ordered Clayton to surrender. Clayton cursed at the officers and temporarily evaded them while attempting to hide what was later identified as the murder weapon in a stack of concrete blocks. Clayton eventually surrendered. While on the way to the police station, Clayton told officers that he had been with a friend all evening, watching television and drinking beer.

The police investigation, including eyewitness testimony, strongly linked Clayton to the scene of the crime. Specifically, Clayton was observed at the scene before the shooting and leaving the scene in his truck. The gun retrieved from Clayton's property matched the murder weapon. Damage to Clayton's truck matched debris found at the murder scene. Paint on Clayton's truck was similar to paint observed on Officer Castetter's car. Clayton, nonetheless, insisted during questioning that he spent the evening with a friend but offered no other details of his evening. A few months later, while in the county jail, Clayton told his cellmate about the shooting, and recounted the details of the murder to him.

Clayton was charged with first degree murder. At trial, Clayton presented both a reasonable doubt and a diminished capacity defense based upon prior brain damage. Witnesses, including Clayton's brother, testified that Clayton suffered a head injury when he worked at a sawmill. In that accident, a piece of wood pierced his skull, and destroyed a significant portion of brain tissue. Clayton called Dr. Michael Morris, a neurologist who testified that Clayton's brain injury led to a mental defect. During his examination of Clayton, Dr. Morris conducted an MRI, and the doctor explained to the jury that the MRI showed that Clayton lost just under 8% of his brain in the sawmill accident. Clayton also called Dr. Betty Black, a clinical psychologist. Dr. Black testified that Clayton's head injury created dementia and memory problems. Dr. Black concluded that Clayton's brain injury coupled with his alcohol use prevented Clayton from coolly reflecting, planning, or controlling his behavior when he is in an aggravated state. Clayton used the testimony regarding his mental state as evidence of mitigating circumstances at his trial, but he did not contest his competency to stand trial.

During guilt-phase closing arguments, the prosecution criticized the defense experts' testimony. When referring to Clayton's mental health expert, the prosecutor said the following:

And in the face of all this, we're told that the defendant couldn't deliberate. We're told that by, well, Dr. Betty [sic] Back. And I'll talk about her a little bit more. But, folks, I think she said something, and you notice that she didn't want to deal with the facts surrounding this incident, did she? She wanted to deal with her nice little computer tests. She wanted to deal with her nice clean little numbers. This isn't clean; it's murder. It's dirty and it's ugly, and if you don't look at the facts, you don't know what happened. So he couldn't plan. Well, ma'am, we pointed out to her, not only could he plan, he did plan.

"Well, he didn't plan in a socially acceptable manner." Well, I've never met a criminal who did. That is not only unlikely, it's preposterous. It's absolutely preposterous.

"Well, they don't have very good judgment." Well, as far as I'm concerned somebody who buys a Toyota doesn't have very good judgment because I don't like Toyotas. That doesn't mean there's anything wrong with their ability to reason. Folks, it's voodoo, that's all it is. It's an excuse.

After hearing all of the evidence and the arguments, the jury returned a verdict of guilty on the first degree murder charge.

Later, during closing arguments for the penalty phase of the trial, Clayton contended that the State had not shown that the death penalty was an appropriate punishment for Clayton's conduct. Clayton argued that in assessing an appropriate penalty, the jury should consider that the punishment should fit the criminal as well as the crime. When the prosecution presented its closing, the prosecutor stated, "A suggestion to you that there is something wrong with you issuing a death sentence where it is called for is preposterous." And in rebuttal to the defense argument that the punishment fit the crime, the prosecutor said that:

I think counsel said one thing here that is interesting, in that I think it shows the fallacy of what he has suggested to you. And that is he said the

punishment should fit the criminal. You will find that nowhere in our law, nowhere in our tradition. Punishment should fit the crime. That's what you'll find in our law and in our tradition. The focus should not be on the criminal, but should be on the crime, and I think that is instructive.

The prosecutor also referred to the criminal proceedings as "legal niceties" that are afforded to Clayton and that were denied to Officer Castetter because Clayton decided to "play God." In his argument for a sentence of death, the prosecutor stated, "Me, having been a soldier, I guess I can imagine reasons why a person would kill. I don't understand killing a police officer. If you'll kill a police officer, you would kill anyone. That is a figure of authority." The prosecutor also argued that the evidence supported an inference that Clayton went to Ball's mother's home to commit other crimes that night. Clayton did not object to the prosecutor's arguments.

In its instructions to the jury, the court explained that the jury could return a recommendation of death only after considering whether any of the following statutory aggravating circumstances existed: (1) whether Clayton had previously been convicted of second degree assault; (2) whether the murder was committed during the exercise of the victim's official duties as a peace officer; (3) whether the murder involved depravity of mind and, as a result, was outrageously and wantonly vile, horrible, and inhuman; (4) whether the murder was committed for the purpose of avoiding arrest.

Additionally, with respect to aggravating circumstance (3), the jury was told that it could make a finding that the murder involved depravity of mind only if they determined that the defendant's selection of the person killed was random and without regard to the victim's identity and that the defendant's killing of the officer exhibited a callous disregard for the sanctity of all human life. In his closing, the prosecutor argued that the murder was random. The jury returned a finding that factors 1, 2, and

3 existed, and, as a result, the jury returned a sentence of death. The trial court denied Clayton's request for a new trial and accepted the jury's sentencing recommendation.

Clayton appealed his conviction on several grounds, including challenges to the prosecutor's comments during the guilt phase and the penalty phase. On direct appeal to the Missouri Supreme Court, Clayton's conviction and sentence were affirmed. Clayton petitioned the United States Supreme Court for a writ of certiorari, but his petition was denied. Clayton then exhausted all available state postconviction remedies. Then, Clayton filed this action seeking relief through a writ of habeas corpus petition.

In his habeas petition, Clayton argued that he should be granted relief on three grounds: (1) the prosecutor's statements during the guilt and penalty phases of his trial violated his due process rights, (2) the jury instructions were defective and violated his due process rights, and (3) Clayton is actually innocent because he was incapable of deliberating before his actions. In addition to these constitutional claims, Clayton also asserts that the habeas proceedings should be stayed because he is presently incompetent to proceed.

Clayton's competency to participate in the proceedings against him first surfaced near the inception of the state proceedings. While awaiting trial on the murder charge, jail officials suspected psychosis and doctors prescribed him antipsychotic medication. These officials also suggested to his attorneys that they conduct a competency evaluation, but no such evaluation was completed. And, Clayton never raised his competency to stand trial before the State of Missouri. Clayton did argue that his mental disabilities should be taken into account when assessing the appropriateness of the death penalty.

Below, in the instant proceeding, Clayton argued that his brain injury impaired his ability to communicate with counsel, understand the proceedings, and make

decisions about the proceedings rendering him incompetent to proceed. The district court allowed Clayton to retain an expert to evaluate his competence. Initially, the district court provided $10,000 for an evaluation of Clayton by Dr. James Merikangas. but this allotment was later reduced to $7500, representing the maximum the district court could authorize without prior approval by the chief judge. Dr. Merikangas told Clayton's counsel that MRI and SPECT scans were needed before he could do a complete evaluation because Clayton's original MRI records had been destroyed. These additional tests were not done because their cost exceeded the court's $7500 order. Dr. Merikangas did not submit a written report to the district court.

Clayton was also evaluated by Dr. Lea Ann Preston, a psychologist on the staff at the United States Medical Center for Federal Prisoners. Clayton was at the facility for seven months. Dr. Preston issued an extensive report, and concluded that Clayton was not competent to assist his attorney. In the report she stated:

> Mr. Clayton's tangential speech, impaired judgment, and impaired reasoning abilities, will negatively affect his ability to communicate effectively with his counsel, testify relevantly, and make rational decisions regarding his habeas proceedings. Consequently, it is my opinion he is likely not competent to proceed.

The district court denied Clayton's petition for a stay of the proceedings based on his competence. The district court disagreed with Dr. Preston's conclusion that Clayton was incompetent and also refused Clayton's petition for a hearing on the matter. Now Clayton appeals the denial of his petition for relief and maintains that he is presently incompetent to proceed.

## II. *Discussion*

Clayton raises four arguments on appeal: (1) he claims that he has a right not to proceed in habeas if he is not presently competent, and the district court erred in denying this claim without holding a hearing to determine whether he is presently

competent; (2) Clayton asserts that the prosecutor violated his due process rights with several comments he made during both the guilt and penalty phases of Clayton's trial; (3) Clayton challenges the jury instructions as a violation of the Due Process Clause; and (4) Clayton argues that the district court erred in refusing to grant him a hearing to determine if he is actually innocent.

### A. *Clayton's Present Competency*

Clayton asserts that the district court erred in denying his competency claim without holding a hearing and because the court did not provide sufficient funds to pay for an expert. Clayton asserts that he has presented substantial evidence to prove his incompetence and that he has, in fact, been incompetent throughout the post-conviction period. Clayton requests that the district court be ordered to fully fund his competency expert and grant him an evidentiary hearing to determine whether he is competent. Clayton claims that the court's failure to do so is a violation of his rights under the Due Process Clause.

We review the district court's decision to rule on Clayton's claim without holding a hearing for abuse of discretion. *Osborne v. Purkett*, 411 F.3d 911, 915 (8th Cir. 2005). The district court's competency determination is a factual finding, so we review this determination for clear error. *Nooner v. Norris*, 402 F.3d 801, 804 (8th Cir. 2005).

The district court did not abuse its discretion in denying Clayton a competency hearing. The district court has broad discretion to determine when to order a hearing on a matter in a habeas proceeding. *Osborne*, 411 F.3d at 915. Here, the district court determined that a hearing was unnecessary because all of the relevant information was before the court. Extensive medical data and detailed opinions from the doctors who examined Clayton were available to the court when it ruled that Clayton is presently competent to proceed. Further, Clayton does not allege that any additional evidence would be elicited at a hearing. Under these circumstances, the denial of a hearing

cannot be said to be an abuse of discretion. *See Campbell v. Vaughn*, 209 F.3d 280, 287 (3rd Cir. 2000) (recognizing that when habeas courts exercise their discretion whether to hold a hearing on a matter, "courts focus on whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim.").

Our cases have not specifically answered the question whether an inmate must be competent to proceed in a habeas claim. Given the nature of the district court's decision, we do not need to do so now. Rather than resolve the question whether such a requirement exists, the district court assumed that competency is required. The court then addressed the level of competency needed to proceed. According to the district court, to demonstrate competency, it must be shown that Clayton is able to "understand the purpose of the habeas proceeding, . . . recall and relate information relevant to a habeas petition and make limited decisions such as filing or dismissing his petition."[2] The district court found Clayton met that standard. We agree.

The district court's finding that Clayton is competent is not clearly erroneous. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Martinez*, 446 F.3d 878, 881 (8th Cir.

---

[2]We have not yet had the opportunity to state whether competency on the part of the defendant is required at this level of review, or to set out the appropriate standard to apply to determine if the defendant is presently competent. Clayton, however, does not challenge the standard used by the district court; his arguments focus on why this standard is not met. Therefore, for purposes of this appeal, we assume, without deciding, that competency is required to proceed in a habeas proceeding and that the district court applied the appropriate standard. Additionally, we note that the Seventh Circuit has recently handed down a case regarding the competency requirements of a habeas defendant, and that circuit's standard is substantially similar to the one applied by the district court. *See Holmes v. Buss*, 506 F.3d 576, 580 (7th Cir. 2007).

2006). The district court's competency finding is adequately supported in the record, Dr. Preston's opinion notwithstanding. Dr. Preston conducted objective tests that indicated that Clayton has the ability to understand the legal proceedings and communicate with counsel provided that his counsel is patient in eliciting information. Further, the court noted, at this stage of his habeas proceedings, Clayton's participation does not require him to make any major decisions.

Dr. Preston ultimately concluded that Clayton was incompetent, but "expert opinion on competency rises no higher than the reasons on which it is based." *Feguer v. United States*, 302 F.2d 214, 236 (8th Cir. 1962). This does not mean that the district court is free to completely ignore Dr. Preston's conclusions. *See Mason v. United States*, 402 F.2d 732, 737 (8th Cir. 1968) (stating that "even though expert opinion evidence is generally advisory in nature, it cannot be arbitrarily ignored.") (quoting *Mims v. United States*, 375 F.2d 135, 143–44 (5th Cir. 1967). Here, though, the district court did not arbitrarily discount Dr. Preston's competency opinion. Rather, the court placed more emphasis on the objective findings from the tests the doctor performed than on her ultimate conclusion. In reviewing all of the record, we cannot say definitively that a mistake has been made; therefore, the finding of the district court that Clayton is competent to proceed in habeas is not clearly erroneous.

Finally, the district court did not err in refusing to provide additional funds for Clayton's expert. The district court must provide funds to procure a defendant's expert opinion if the court determines that the services are reasonably necessary and the amount does not exceed $7500. 21 U.S.C. § 848(q)(10(B). Clayton was evaluated by two experts—an expert of his choosing and an expert from the Federal Bureau of Prisons. The doctors conducted the necessary tests to determine Clayton's psychological condition. Additional funds were not reasonably necessary to evaluate his mental competence. The district court did not err in refusing to provide additional funds for Clayton's expert who wanted them to repeat medical tests that would likely only confirm an undisputed physical diagnosis of severe brain injury. Despite the

expenditure of $7,500, Clayton offered no report from Dr. Merikangas. We hold that the district court did not err in declining to grant additional expert witness fees.

B. *Appropriateness of the Prosecutor's Comments*

Clayton next claims that his due process rights were violated by several statements made by the prosecutor during the guilt and sentencing phases of the trial. Specifically, he challenges the prosecutor's comments that: (1) disparaged the opinion of one of Clayton's mental-health experts; (2) mentioned Clayton's probable intent to commit other crimes when he went to Ball's home; (3) mentioned the prosecutor's time as a soldier; (4) described the defense argument against the death penalty as preposterous; (5) referred to aspects of Clayton's criminal proceedings as "legal niceties"; and (6) averred that the punishment should fit the crime, not the criminal. Clayton did not object to these statements before the state trial court.

We review the district court's denial of this due process claim de novo. *See White v. Kautzky*, 494 F.3d 677, 679 (8th Cir. 2007) (stating that the court reviews the legal conclusions of the district court de novo).

Clayton's due process rights were not violated by the prosecutor's comments during the closing arguments at trial. A prosecutor is given wide latitude in making a closing argument. *See United States v. Robinson*, 110 F.3d 1320, 1327 (8th Cir. 1997) (stating that "so long as prosecutors do not stray from the evidence and the reasonable inferences that may be drawn from it, they, no less than defense counsel, are free to use colorful and forceful language in their arguments to the jury."). If a prosecutor goes too far during the argument, there may be a violation of the defendant's rights; such a violation occurs if the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642–43 (1974). To determine if the prosecutor violated Clayton's due process rights, we must first determine if the prosecutor's statements were inappropriate and then decide if the comments unfairly

-11-

prejudiced Clayton. *See Shurn v. Delo*, 177 F.3d 662, 667 (8th Cir. 1999) ("Though improper, [an] argument does not require reversal of [a] sentence unless it amounted to prejudicial error.").

Viewing each of the prosecutor's comments in context we cannot say that the comments strayed impermissibly from the broad latitude afforded counsel in closing arguments. These comments individually or combined did not so infect the trial with unfairness so as to deny Clayton due process. The trial court adequately instructed the jury, and the factual case against Clayton was very strong.

## C. *Jury Instructions*

Clayton next claims that the jury instructions violated the Due Process Clause and the Eighth Amendment prohibition against cruel and unusual punishment. Clayton claims that his constitutional rights were violated when the court instructed the jury that it could consider whether Officer Castetter was randomly selected when no evidence was presented on the point. Clayton also claims that the jury's findings that Officer Castetter was randomly selected and that he was killed because he was a peace officer are inherently in conflict.

We review the district court's denial of Clayton's constitutional claims de novo. *White*, 494 F.3d at 679. "All errors of constitutional dimension do not automatically call for reversal." *United States v. Jacobs*, 97 F.3d 275, 283 (8th Cir. 1996). We will not reverse unless the violation has harmed the defendant. *Id.*

We find no reversible error in the trial court's instructions. Even assuming the trial court erred in including the depraved-mind or random-killing aggravating factor with the peace-officer aggravating factor, Clayton does not identify any improper evidence that was introduced to the jury because the district court included both aggravators. Under the test as set out by the Supreme Court in *Brown v. Sanders*, such an error would be harmless if "one of the other sentencing factors enables the

-12-

sentencer to give aggravating weight to the same facts and circumstances." 546 U.S. 212, 220 (2006). Clayton argues that he was unfairly prejudiced by the prosecutor's use of the evidence surrounding the murder of Officer Castetter to prove randomness. The fatal flaw in Clayton's argument is that he cannot cite any additional facts that came before the jury based on the inclusion of the random-killing aggravator that could not have also come in under the peace-officer aggravator. Because all of the evidence was properly before the jury to consider each aggravator, there was no prejudice to Clayton by including both aggravators.

## D. *Actual Innocence*

Finally, Clayton argues that the district court abused its discretion in denying him a hearing to demonstrate his actual innocence based on his inability to deliberate. This claim is not cognizable in this federal review of Clayton's conviction. "[C]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). In this case, Clayton cannot point to an independent constitutional violation that occurred in his state criminal proceeding; therefore, we are without jurisdiction to decide his claim of actual innocence.

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

BYE, Circuit Judge, concurring.

I can concur in the Court's opinion, including Section II(B), addressing the prosecutor's closing arguments. I agree with the conclusion the prosecutor's arguments "individually or combined did not so infect the trial with unfairness so as to deny Clayton due process." Ante at 12. I do write separately, however, to point out

the impropriety of the prosecutor's argument about the law not requiring the punishment to fit the criminal in a capital case.

The Court's opinion sets forth a portion of the prosecutor's improper argument, which bears repeating:

> I think counsel said one thing here that is interesting, in that I think it shows the fallacy of what he has suggested to you. And that is he said the punishment should fit the criminal. You will find that nowhere in our law, nowhere in our tradition. Punishment should fit the crime. That's what you'll find in our law and in our tradition. The focus should not be on the criminal, but should be on the crime, and I think that is instructive.

The prosecutor further expounded on this point by adding:

> Punishment here must fit the crime, and if it doesn't then it diminishes us all. We are not here to judge Cecil Clayton as a person, we are here to punish him for the crime he's committed. There is a difference. The crime calls for the ultimate penalty, and that's what I ask you for.

These comments are directly contrary to well-established Supreme Court precedent emphasizing the importance of an individualized decision-making process in capital cases. Capital cases not only permit, but *mandate*, that the punishment fit the criminal. Thus, the prosecutor's comments were improper and inconsistent with Clayton's constitutional right to have the jury's sentencing decision rest upon an individualized inquiry. The prosecutor should have known better than to tell the jury this concept is not part of our law, not part of our tradition. Indeed, we have previously recognized such comments as justifying the grant of habeas relief. See Weaver v. Bowersox, 438 F.3d 832, 841 (8th Cir. 2006) (citing Jones v. United States, 527 U.S. 373, 381 (1999); Buchanan v. Angelone, 522 U.S. 269, 274-75 (1998); Romano v. Oklahoma, 512 U.S. 1, 7 (1994); McCleskey v. Kemp, 481 U.S. 279, 303

-14-

(1987); <u>Harmelin v. Michigan</u>, 501 U.S. 957, 995 (1991); <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305 (1976); <u>Zant v. Stephens</u>, 462 U.S. 862, 879 (1983)).

In <u>Weaver</u>, however, the very focus of the prosecutor's closing argument was to persuade the jury to disregard the individualized decision-making process required by the Constitution. My concurring opinion therein noted "[n]ot once, not twice, not thrice, but *seven* times the prosecutor urged the jury to ignore the individual offender, William Weaver." <u>Id.</u> at 843 (Bye, J., concurring). Such thankfully is not the case here.

The above comments are the only instances identified by Clayton where the prosecutor improperly told the jury the law did not require the punishment to fit the criminal. As the district court noted, immediately after making the above comments, the prosecutor nevertheless focused the jury upon Cecil Clayton, the individual, by discussing Clayton's functioning abilities. In addition, the jury was properly instructed to consider the mitigating factors unique to Clayton in determining whether to impose the death penalty.

As a consequence, although this limited portion of the prosecutor's argument was improper, I cannot conclude the Missouri Supreme Court was unreasonably wrong when it determined the argument did not violate Clayton's due process rights.

I therefore concur in the Court's opinion.

_____