

# SUPREME COURT OF MISSOURI
## en banc

STATE EX REL. CECIL CLAYTON,    )
                                )
                    Petitioner, )
                                )
v.                              )    No. SC94841
                                )
CINDY GRIFFITH, in her capacity as  )
WARDEN, POTOSI CORRECTIONAL      )
CENTER,                         )
                                )
                    Respondent. )

ORIGINAL PROCEEDING IN HABEAS CORPUS

*Opinion issued March 14, 2015*

On February 6, 2015, this Court scheduled the execution of Petitioner Cecil Clayton ("Clayton") for March 17, 2015.  On March 10, 2015, Clayton filed a petition for writ of habeas corpus claiming that he is not competent to be executed under *Ford v. Wainwright*, 477 U.S. 399 (1986), *Panetti v. Quarterman*, 551 U.S. 930 (2007), and section 552.060.1, RSMo 2000.  Addressing the merits of Clayton's petition, this Court finds that he has failed to make the threshold showing required by *Ford* and *Panetti* to justify staying his execution so that his competence can be determined after an evidentiary hearing.

## Background

Clayton's conviction and death sentence were affirmed by this Court in *State v. Clayton*, 995 S.W.2d 468, 472 (Mo. banc 1999) (*Clayton I*). His motion for post-conviction relief was overruled, and this Court affirmed that decision as well. *Clayton v. State*, 63 S.W.3d 201 (Mo. banc 2001) (*Clayton II*). The United States District Court for the Western District of Missouri, Judge Laughrey presiding, denied Clayton's federal petition for a writ of habeas corpus, *Clayton v. Luebbers*, 2006 WL 1128803 (April 27, 2006) (*Clayton III*), and that decision was affirmed by the United States Court of Appeals in *Clayton v. Roper*, 515 F.3d 784 (8th Cir. 2008) (*Clayton IV*).

## I.    Clayton's Crime

Clayton's petition does not claim that he is innocent of the crime for which he has been sentenced to death. In 1996, Clayton became angry at his girlfriend in a convenience store in Purdy, Missouri. *Clayton I*, 995 S.W.2d at 473-74. When Clayton pushed his girlfriend, a clerk in the store phoned the sheriff's department. The Purdy police chief arrived and waited there until Clayton and his girlfriend left separately. *Id.* at 473. Within an hour, Clayton drove his truck to his girlfriend's residence. She was not there, but her sister called the sheriff's department when she saw Clayton sitting in his truck in their driveway. *Id.* Deputy Castetter was dispatched and arrived at the residence at 10:03 p.m. Three or four minutes later, two other deputies arrived to help Deputy Castetter deal with Clayton. When they arrived, however, they found Deputy Castetter in his patrol car, bleeding profusely from a point-blank gunshot wound to his forehead. *Id.*

His gun was still in his holster. Deputy Castetter was taken to the hospital but soon died of his wound. *Id.* at 474.

Within 15 minutes of this murder, Clayton arrived at a friend's house, brandished a pistol, and exclaimed "would you believe me, if I told you that I shot a policeman, would you believe me?" *Id.* Clayton told his friend he needed him to provide an alibi. Clayton then drove his friend to Clayton's house. Less than a half hour after the crime, the two arrived at Clayton's home just as the police were arriving there to question him about Deputy Castetter's murder. Clayton asked his friend "should I shoot them?" His friend answered "No." *Id.* Clayton got out of his truck and, claiming he could not hear the officers, walked away from them and toward the side of his house with his right hand in his pocket. The officers saw him take something out of the pocket and put it in a stack of concrete blocks next to his house.

The officers arrested Clayton and later found his gun among the concrete blocks. *Id.* In a subsequent interrogation, Clayton stated that Deputy Castetter "probably should have just stayed home" and that "he shouldn't have smarted off to me." Clayton added, however, "I don't know because I wasn't out there." Later, Clayton admitted his involvement in Deputy Castetter's murder to a cellmate. *Clayton II*, 63 S.W.3d at 204.

## II. Clayton's Brain Injury

Clayton was 56 years old in 1996 when he killed Deputy Castetter. Approximately 24 years before he committed that crime, Clayton was injured while working in a sawmill. A piece of wood broke off a log he was sawing and lodged in Clayton's head. Surgery was required to remove the object, and this procedure resulted

in the loss of nearly eight percent of Clayton's brain and 20 percent of a frontal lobe. *Clayton II*, 63 S.W.3d at 205. At trial, Clayton's brother Marvin testified that, after the injury, Clayton changed. "He broke up with his wife, began drinking alcohol and became impatient, unable to work and more prone to violent outbursts." *Id.* at 204. Another brother, Jerry, testified during the penalty phase about Clayton's "childhood and life as a part-time pastor and evangelist prior to the sawmill accident and, after the accident, his marital breakup, drinking alcohol and his antisocial personality." *Id.*

### III. Impact of Clayton's Injury on his Culpability and Competence

From the beginning of this prosecution, Clayton has argued that the effects of his 1972 accident left him blameless for the 1996 murder of Deputy Castetter and/or incompetent to proceed in some – but not all – stages of his case.

#### A. Trial

During the guilt phase of his trial, Clayton argued that the accident rendered him incapable of deliberating or forming the intent necessary for the jury to find him guilty of first-degree murder. *Clayton II*, 63 S.W.3d at 204. In addition to the testimony from his brother, two experts testified that he was not capable of "deliberating, planning, or otherwise coolly reflecting on a murder when agitated" and that his inculpatory statements to the police should be discounted because his injury made him unusually "susceptible to suggestion." *Id.* The jury rejected this evidence and found Clayton guilty of first-degree murder. In the penalty phase of his trial, Clayton argued that his injury was a mitigating factor that should make the death penalty inappropriate in his case. *Id.*

4

at 209-10.  The jury rejected this as well and recommended that Clayton be sentenced to death.

Clayton did not argue at trial that he was insane at the time of the murder or that he was incompetent to stand trial.  When he later claimed that his trial counsel was constitutionally ineffective for failing to challenge his competence to be tried, this Court held:  "Counsel has no duty to investigate a client's mental condition where the client appears to have the present ability to consult rationally with the attorney and understand the court proceedings."  *Id.* at 209.  Because "Clayton was able to intelligently discuss his legal options with his attorney, and even carry on correspondence with him about the case, [his] attorney could reasonably conclude that [Clayton] was competent to stand trial."  *Id.*

In addition, this Court held there was no evidence that Clayton actually was incompetent.  Noting that the motion court had good reason to reject Clayton's expert witness's testimony in denying Clayton's motion for post-conviction relief, this Court stated that "Dr. Foster's determination is especially questionable because even though he said Clayton was incompetent at the time of his trial, he admitted that Clayton understood the role of the prosecutor, the judge, the juror, and even his own attorney in the process."  *Id.*  More important, when this expert examined Clayton three years after his trial, Dr. Foster admitted that "Clayton knew what he was charged with, that he was facing the death penalty, and that he was able to discuss his various options with his attorney."  *Id.*  Accordingly, this Court held:  "The judge, who had also presided during Clayton's trial,

5

had more than a reasonable basis to concluded [sic] that Dr. Foster's testimony was not credible and that Clayton was competent at the time of his trial." *Id.*

## B. Federal Habeas

Clayton raised numerous claims in his federal petition for a writ of habeas corpus, including many based on the impairments created by his 1972 accident and resulting brain injury. Though not conclusive of the question now before this Court, these claims and the District Court's rejection of them are relevant because Clayton's competence argument relies on a condition that existed throughout his legal proceedings and – even though his experts refer to the condition worsening with age – neither Clayton nor his experts identify any evidence to support the fact that his competence is materially worse now than in 2005 and 2006 when his federal habeas petition was litigated and rejected.

### 1. Dual Defense Theories

In 2006, as part of his petition for habeas relief in the federal courts, Clayton claimed that his trial counsel was ineffective for arguing both that Clayton was not the murderer and that, even if Clayton did kill Deputy Castetter, Clayton's brain injury precluded him from forming the necessary intent and deliberation. *Clayton III*, 2006 WL 1128803, at *5-8. The District Court noted that this Court had rejected this claim, in part, because this Court earlier had reached the conclusion that Clayton "did not have a good defense under either theory." *Id.* at *7 (citing *Clayton II*, 63 S.W.3d at 206-07). The District Court held there was "ample evidence" to support this conclusion. *Id.* at *8.

6

## 2. Additional Evidence of Impairment at Trial

The District Court also rejected Clayton's claim that his trial counsel should have introduced voluminous records from his extended hospital stay after his injury. "The records Clayton now complains about would have complicated [the simple] picture [that counsel wanted to present] and shown the jury that Clayton was also a violent man with a criminal record even before the accident occurred." *Clayton III*, 2006 WL 1128803, at *8 (quoting *Clayton II*, 63 S.W.3d at 208). Similarly, the District Court agreed with this Court's decision that Clayton's counsel was not ineffective for electing not to present a witness who, on cross-examination, would have had to admit "that Clayton had a violent temper even before his accident, undercutting Clayton's diminished capacity defense." *Id.* at *11 (quoting *Clayton II*, 63 S.W.3d at 209).

## 3. Clayton was Competent to Stand Trial

The District Court also agreed with this Court's conclusion that Clayton's counsel had no reasonable basis to challenge Clayton's competence to stand trial. Noting that, even though Clayton's expert psychologist had not been retained specifically to evaluate his competence, Clayton's expert testified that defense counsel had asked her to "let him know if there was a problem with Clayton's competency." *Clayton III*, 2006 WL 1128803, at *12. "Dr. Back stated that she believed in June 1997 that Clayton was competent to stand trial and that, had she thought otherwise, she would have told [defense counsel] he was not competent." *Id.*

Not only was counsel reasonable in relying on this expert, the District Court agreed with this Court's holding that Clayton failed to show that he actually was

7

incompetent to be tried. *Id.* at *14. Clayton's claim was based on the testimony of Dr. Foster, but the District Court held that the "Missouri courts' decision to give no weight to Dr. Foster's testimony is well supported by the evidence in the record[.]" *Id.* "Dr. Foster testified that Clayton understood the proceedings, the charges against him and that he faced the death penalty, that he had the right not to testify, and the role of different participants in the trial, including his attorneys, the prosecutor, the judge, and the jury." The District Court concluded that these concessions contradicted Dr. Foster's assertion Clayton was not competent and justified this Court's (and the post-conviction motion court's) decisions not to give any weight to it. *Id.*

### 4. Clayton was not Mentally Retarded

The District Court also rejected Clayton's claim, based on *Atkins v. Virginia,* 536 U.S. 304 (2002), that due process prohibited his being sentenced to death. Even though *Atkins* holds that the constitution prohibits the execution of mentally retarded criminals, the District Court noted that *Atkins* is limited to "mentally retarded individuals who satisfy state standards for retardation." *Clayton III*, 2006 WL 1128803, at *43 (citing *Atkins,* 536 U.S. at 317). The District Court held that Clayton's claim must fail, therefore, because he "has not presented evidence that any of his symptoms manifested before the age of eighteen – a necessary requirement under the [Missouri] statutory definition." *Id.* (citing § 565.030.6, RSMo Supp. 2013).

In addition to this shortcoming, the District Court also noted that Dr. Back, Clayton's expert during his post-conviction proceedings, admitted that Clayton "was not retarded when she evaluated him in 2000." *Id*. at *44. "Dr. Back evaluated Clayton less

8

than one year after he killed Castetter and his IQ scores placed Clayton within the low average range of intellectual functioning." *Id.* Dr. Black's conclusion was reinforced by the 2005 psychiatric evaluation that the District Court ordered be conducted by Dr. Preston of the Medical Center for Federal Prisoners. When given tests designed to show the degree of impairment among mentally retarded persons, Clayton "received scores that were consistent with presumed competent individuals without mental retardation." *Id.* (citing Dr. Preston's Report at p. 26). Accordingly, the District Court held that "the record refutes his claim that at the time of the murder, or at any time since, [Clayton] functioned at the level of a mentally retarded person." *Id.* at *43.

### 5. Clayton was not Insane at the Time of the Offense

The District Court rejected Clayton's claim that his conviction and death sentence violate due process because his brain injury meant he could not be criminally responsible for the murder of Deputy Castetter under section 552.030.1, RSMo 2000, which provides that "a person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect such person was incapable of knowing and appreciating the nature, quality, or wrongfulness of such person's conduct." *Clayton III*, 2006 WL 1128803, at *41. Again, Clayton based this claim on the opinions of Dr. Foster but, after reviewing this expert's testimony, the District Court held "it is unlikely the jury would give it substantial weight." *Id.* Even assuming that Dr. Foster's testimony was credible, the District Court found that his testimony contradicted rather than supported Clayton's claim because "Dr. Foster testified that Clayton knew his conduct was wrong and

9

understood the quality and nature of his act." *Id.* Moreover, "at Clayton's trial Dr. Back testified that Clayton had the ability to distinguish between right and wrong." *Id.* "In short, Clayton's own expert's testimony shows that he did not meet the criteria for insanity" set forth in section 552.030.1. *Id.*

### 6.    Clayton was Competent During his Habeas Proceeding

Even though the District Court rejected Clayton's claims that the brain injury he suffered in the 1972 accident absolved him of criminal liability for the 1996 murder of Deputy Castetter and/or rendered him incompetent to be tried for that crime, the District Court ordered that a new psychiatric evaluation be performed in 2005 to assist it in determining: (1) whether Clayton was competent to understand and assist with his federal habeas proceedings; and (2) whether Clayton was competent to be executed under the Eighth Amendment standard set forth in *Ford*. This psychiatric evaluation was performed by Dr. Preston of the Medical Center for Federal Prisoners, who prepared a forensic report for the District Court. Dr. Preston's report concluded:

> Clayton demonstrated a good factual and rational understanding of the legal system and the process of adjudication. More specifically, during clinical interviews, he demonstrated an adequate rational understanding of the habeas corpus proceedings. He understood the roles of the various individuals involved in this process as well as the possible outcomes. His cognitive deficits did not appear to negatively impact his ability to understand his present legal proceedings.

District Court Order dated April 27, 2006 (the "*Competency Order*") at p. 15 (quoting Dr. Preston's report at p. 30).

Regarding Clayton's ability to communicate with counsel and make rational decisions, the District Court noted that "Dr. Preston also acknowledged

10

that Clayton is capable of communication with his lawyer, but emphasized that it takes more time and effort than with a fully functioning client." *Competency Order* at p. 15. *See also Clatyon IV*, 515 F.2d at 791 ("Clayton has the ability to understand the legal proceedings and communicate with counsel provided that his counsel is patient in eliciting information"). Moreover, neither Clayton's federal counsel nor the two prior counsel who submitted affidavits complained they were unable to obtain relevant factual information from Clayton. In fact, Dr. Preston "concluded that Dr. Back's earlier diagnosis of dementia was not correct" and she "did not find Clayton to have any significant impairment in memory." *Competency Order* at p. 17 (citing Dr. Preston's Report at pp. 26-28). The District Court noted that "Clayton consistently was found to be functioning above the level for a mentally retarded person, and his performance on tests assessing memory, although weak at times, did not suggest severe impairment." *Id.*

Accordingly, based on Dr. Preston's Report, the District Court concluded that even though "Clayton's judgment is impaired, he has failed to show that the impairment requires a stay" on the ground that he is incompetent to proceed. *Id.* at p. 18. This decision was affirmed. *Clatyon IV*, 515 F.2d at 790. The District Court reached this conclusion notwithstanding Dr. Preston's "ultimate conclusion" that Clayton was incompetent to proceed. *Competency Order* at p. 18. As the District Court explained, competency is a legal determination that must be made by the court and not by experts. *Id. See also Clatyon IV*, 515 F.2d at 791 ("expert opinion on competency rises no higher than the reasons on which it is based").

11

"Because Dr. Preston's objective observations and the tests which she reviewed show that Clayton is competent to proceed with his habeas corpus action, the Court is not persuaded by Dr. Preston's ultimate conclusion." *Competency Order* at p. 18. *See also Clatyon IV*, 515 F.2d at 791 ("the court placed more emphasis on the objective findings from the tests the doctor performed than on her ultimate conclusion")

### 7. Clayton was Competent to be Executed

Regarding Clayton's claims that he was not competent to be executed, the District Court first compared the standard for competence to stand trial, *see Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) ("a rational as well as functional understanding of the proceedings against him" and a "sufficient present ability to consult with [the defendant]'s lawyer with a reasonable degree of rational understanding"), with the standard for competence to be executed, which the District Court stated "required only that the convicted defendant be aware of the punishment the defendant was about to suffer and why the defendant was going to suffer it." *Competency Order* at p. 11 (citing *Ford*, 477 U.S. at 422). The District Court concluded that, assuming competence is even an issue in federal habeas proceedings (an assumption proved wrong by *Ryan v. Gonzales*, 133 S. Ct. 696, 702 (2013)), the standard for such competence must require greater abilities than the standard for competence to be executed but fewer abilities than required by the standard of competence to stand trial originally. *Id.* at 11, 14. Accordingly, because Clayton was competent to proceed with his federal habeas petition,

the District Court needed no additional analysis to reject Clayton's claim that he was incompetent to be executed:

> Clayton asserts that he is incompetent to be executed under the standard set forth in *Ford v. Wainwright,* 477 U.S. 399 (1986). His recent competency examination shows that he is competent to be executed. Clayton's thirtieth claim is denied.

*Clayton III*, 2006 WL 1128803, at *44.

### C. Clayton's Current Petition Alleging He is Incompetent to be Executed

Clayton filed this action on March 10, 2015, more than four weeks after this Court's February 6 order scheduling Clayton's execution for March 17. This delay is not attributable to any need to gather evidence because the most recent of Clayton's exhibits is dated in early January 2015. Instead, this delay is due to the tactical decisions of Clayton's counsel seeking to avoid litigating this claim in this Court. On January 9, 2015, Clayton filed a civil rights action and motion for a stay of execution in federal court claiming that he was not competent to be executed. This case was assigned to the same District Court that, in 2006, denied Clayton's habeas petition and found that he was competent to be executed.

Last year, John Middleton sought to litigate his competence in the federal courts without first raising the issue in this Court. The Eighth Circuit rejected that approach:

> The Missouri courts are the proper forum in the first instance for Middleton's claim of incompetency to be executed. The likelihood of success of a *Ford* claim in a federal habeas petition depends on how the Missouri courts dispose of such a claim. *See* 28 U.S.C. § 2254(d); *Panetti,* 551 U.S. at 948, 127 S.Ct. 2842. Middleton thus far has declined, perhaps for tactical reasons in light of § 2254(d), to advance a *Ford* claim before the Supreme Court of Missouri. But that is where the claim must be presented in the first instance. Whatever might be said about possible justifications

13

for Middleton's failure to bring a *Ford* claim until fewer than 48 hours before the scheduled execution, there is no reason why Middleton cannot present a *Ford* claim and a motion for stay of execution to the Missouri courts in light of this court's decision of July 15.

*Middleton v. Roper*, 759 F.3d 867, 869, (8th Cir. 2014) (*Middleton II*). Thereafter, Middleton filed his competency action in this Court, and that petition was denied for lack of merit. *State ex rel. Middleton v. Russell*, 435 S.W.3d 83 (Mo. banc 2014) (*Middleton III*).

Here, finding no meaningful distinction between Clayton's tactic and Middleton's approach that was rejected by the Court of Appeals, the District Court dismissed Clayton's federal suit on February 24, 2015:

> Clayton seeks a stay of the March 17, 2015 execution date set by the Missouri Supreme Court. In [*Middleton v. Roper,* 759 F.3d 833 (8th Cir. 2014) (*Middleton I*),] the Eighth Circuit held that the district court abused its discretion by staying the inmate's execution for the purpose of holding a hearing on a *Ford* claim that had not been presented in the first instance to the Missouri state courts. 759 F.3d at 835-36.
> In [*Middleton II*)], issued the following day, the Eighth Circuit held that the district court had abused its discretion in granting an indefinite stay of execution, because the inmate had not shown a substantial likelihood of success on the merits of a *Ford* claim in his federal habeas petition. 759 F.3d at 869. And the likelihood of success in federal habeas depended on how the Missouri courts disposed of such a claim. *Id.* There was no reason why the inmate could not present both his *Ford* claim and motion for stay of execution in the state courts. *Id.*
> In view of *Middleton I* and *II*, and this Court's dismissal of Clayton's case, Clayton's motion for a stay of execution is denied, without prejudice.

*Clayton v. Lombardi*, Case No. 4-15:cv-04003-NKL (order of dismissal) (Feb. 24, 2015), at pp. 5-6.

14

Even though only three weeks remained until Clayton's execution, his counsel chose not to file his competency claim in this Court, as the District Court held he must. Instead, Clayton's counsel waited until March 2 and then filed a "Motion to Alter or Amend" the District Court's judgment dismissing his suit. Only when that motion was denied (on March 9) did counsel file the present petition.

**Analysis**

Clayton's petition asserts three claims: (1) that Clayton is incompetent to be executed under *Ford* and *Panetti* and section 552.060.1, RSMo 2000; (2) that section 552.060.2, RSMo 2000 is unconstitutional "insofar as it permits the director of the Department of Corrections, a member of the executive branch who is charged with conducting the execution, to determine a prisoner's competence to be executed;" and (3) that Clayton is intellectually disabled and cannot be executed under *Atkins*. In support of these claims, Clayton relies principally on the evaluations performed by Dr. Foster and Dr. Preston, referred to above, as well as those performed by Dr. Logan.

## I. Clayton is Competent to be Executed

The standard for an Eighth Amendment claim that a prisoner is not competent to be executed is found in *Ford* and *Panetti*. "[T]he Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane." *Ford,* 477 U.S. at 409–410. *See also Panetti*, 551 U.S. at 934. This constitutional protection "prohibits execution of one whose mental illness prevents him from comprehending the reasons for the penalty or its implications … [or is] unaware of the punishment they are about to

15

suffer and why they are to suffer it." *Panetti*, 551 U.S. at 957 (quotation marks and citations omitted).

This standard applies "despite a prisoner's earlier competency to be held responsible for committing a crime and to be tried for it," and earlier findings of competency "do not foreclose a prisoner from proving he is incompetent to be executed because of his present mental condition." *Panetti*, 551 at 934. Under *Ford,* however, a prisoner is not entitled to an adjudication to determine a claim of incompetence on the eve of his execution unless he makes a sufficient threshold showing that his current mental state bars execution. *Id.*

In *Middleton III*, this Court analyzed the requirements of *Ford* and *Panetti* in greater detail.

> In *Panetti,* the Supreme Court explains that the gravamen of an Eighth Amendment incompetence claim is not that an inmate is delusional, but that the inmate suffers from some "mental illness that is the source of gross delusions preventing him from comprehending the meaning and purpose of the punishment to which he has been sentenced." *Id.* at 960[]. The delusions must be such that "they so impair the prisoner's concept of reality that he cannot reach a rational understanding of the reason for the execution." *Id.* at 958.
>
> In *Panetti,* the inmate had a "genuine delusion involving his understanding of the reason for his execution .... [that] recast petitioner's execution as 'part of spiritual warfare ... between the demons and the forces of the darkness and God and the angels and the forces of light.'" *Id.* at 954 (citations omitted). As a result, even though "petitioner claims to understand 'that the state is saying that [it wishes] to execute him for [his] murder[s],' he believes in earnest that the stated reason is a 'sham' and the State in truth wants to execute him 'to stop him from preaching.' " *Id.* at 954–55[].

16

Nothing in Dr. Logan's[1] statement, or in the other proof submitted with Middleton's petition, even approaches a substantial threshold showing that Middleton suffers from such delusions. Instead, at most, they show that Middleton is delusional as to his innocence and his chances of escaping execution. Middleton plainly understands he is to be executed as punishment because he was found guilty of murdering his three victims; he simply believes he should not have been convicted. Nothing in *Panetti* or *Ford* suggests that an inmate is incompetent to be executed only if he both understands why he is being executed and agrees that the sentence is justified.

Instead, the Court in *Panetti* stated:

> The mental state requisite for competence to suffer capital punishment neither presumes nor requires a person who would be considered "normal," or even "rational," in a layperson's understanding of those terms. Someone who is condemned to death for an atrocious murder may be so callous as to be unrepentant; so self-centered and devoid of compassion as to lack all sense of guilt; so adept in transferring blame to others as to be considered, at least in the colloquial sense, to be out of touch with reality. Those states of mind, even if extreme compared to the criminal population at large, are not what petitioner contends lie at the threshold of a competence inquiry. The beginning of doubt about competence in a case like petitioner's is not a misanthropic personality or an amoral character. It is a psychotic disorder.

*Id.* at 959–60 (emphasis omitted).

*Middleton III*, 435 S.W.3d at 85-86 (all emphasis in the original).

Clayton's petition fails for the same reasons expressed in *Middleton III*. The deficiencies in Clayton's evidentiary offerings are discussed below, but even if the Court gives them more weight than they are due, they show no more than what the District Court saw in 2006, i.e., a man who suffers from some cognitive impairment but who understands that he has been found guilty of killing Deputy Castetter and sentenced to

---

[1] Dr. Logan, on whom Clayton relies, also opined that Middleton was not competent to be executed.

17

death for that act. As in *Middleton III*, neither the fact that Clayton believes he should not have been convicted nor the fact that he believes he will be spared execution are sufficient to make a threshold showing that he is incompetent. *Id.* at 85. Clayton's beliefs in these respects are likely mistaken. They may even be delusional. But they are not the sort of delusions described in *Panetti*, and they do not constitute a threshold showing of incompetence as required by *Ford*.

*Panetti* allows for the possibility that an inmate may admit that – according to his jailers – he is to be executed for some criminal act even though he actually is laboring under the genuine (albeit delusional) belief that he is going to be executed for some different, likely bizarre, but utterly unrelated reason. Such circumstances are qualitatively different from the circumstances in *Middleton III* and the present case where the inmate knows he has been convicted of first-degree murder and sentenced to death but labors under the genuine (even delusional) belief that he will not be executed because some outside force – whether judicial, gubernatorial, or supernatural – will intervene and save him. The latter is sad, but it is not unconstitutional. Accordingly, Clayton is not incompetent to be executed.

Seeking to discount the similarity between Clayton's condition and Middleton's, Clayton's counsel and his experts argue that Clayton meets the *Ford* and *Panetti* standard for incompetence because Clayton is delusional in believing God will spare him from execution and Middleton was delusional in believing he would be spared by the courts or the governor. This argument fails. Clayton posits that "religious faith and delusion are not mutually exclusive," Petitioner's Reply Suggestions, at p. 25, but his argument

18

implies that they are synonymous. What made the delusions in *Panetti* sufficient to trigger a full hearing on the inmate's competence was not that the religious themes of the delusions. Instead, it was the fact that there was reason to believe the inmate genuinely believed the true purpose behind his execution was not as punishment for a crime, but to stop him from preaching. The experts on whom Clayton relies admit that Clayton understands that his death sentence was imposed as punishment for killing Deputy Castetter and that it will be carried out for that purpose if not stayed, vacated, or commuted. As explained below, the evidence from these experts (and the other evidence before the Court) falls short of the required threshold showing that Clayton is not competent to be executed.

### A. Dr. Foster

Dr. Foster testified during Clayton's post-conviction proceedings that Clayton's brain injury rendered him insane at the time he murdered Deputy Castetter and left him incompetent to stand trial. The motion court gave no weight to his opinion because it was conclusory and internally inconsistent. This Court affirmed on the same basis. *Clayton II*, 63 S.W.3d at 209.

When Clayton was given an execution date in 2008, Dr. Foster again opined that Clayton was not competent to be executed. This time, he relied heavily on Dr. Preston's report from 2005. In addition, Dr. Foster noted:

> Despite the approaching date of execution, he [Clayton] remains resolute that he is called to preach the gospel and will be released from prison by a miraculous act of God…. He continues to practice his gospel singing in preparation for his ministry once freed, rather than bothering with requests for clemency or extenuation. Concepts beyond him perceptually, not

intellectually.  By now he fancies himself wrongly convicted, though does not have an alternative theory of the crime for which he is convicted.

In November 2013, Dr. Foster "reassessed" Clayton.  He concedes Clayton "seemed aware of his current prison status and the outcome of intervening years (his trial and conviction, the birth of his grandchildren, the death of his son, the loss of his property and estate in the payment to his Attorney at his trial, etc.)."  However, Dr. Foster again opined that Clayton did not meet "the requirements of competency for purposes of the final appellate proceedings."  He stated:

> His [Clayton's] dementia, medically substantiated and described now for 44 years, is of sufficient severity that, to paraphrase Dr. Preston from her Report of January 18, 2005, he lacks the capacity to communicate effectively with his counsel, to testify relevantly if called upon, and to make rational decisions regarding his habeas proceedings.  I found the same problems in 2000 and testified to those findings in September of that year [in Clayton's post-conviction proceedings].  His Dementia had progressed by the time I reassessed him in 2008, and his deterioration the past five years has further lessened his capacity for meaningful participation in his legal proceedings.

Finally, Dr. Foster updated his report in January 2015.  Again, he relies on and quotes from Dr. Preston's report from January 2005.  Though he mentions Clayton's age-related health problems that have occurred since being incarcerated (e.g., hearing loss, vision deficits, coronary artery disease resulting in a triple coronary bypass in 2001, hypertension, arthritic spine, hips, and knees, and a surgically repaired broken leg in 2013), Dr. Foster does not opine that any (or all) of these conditions are what make Clayton incompetent to be executed.  Instead, that opinion is based on the 1972 head injury and its effects, which Dr. Foster says cause Clayton to exhibit "poor judgment, problem solving, mental flexibility, and verbal disinhibition[.]"  He opines that Clayton is

20

"not simply incompetent legally, he would be unable to care for himself or manage basic self care, were he not in a structured environment …. [because even though he] can shower, groom, eat, walk, it is his comprehension, judgment, memory, limited intelligence and social deficits that plague him."

Dr. Foster's opinions are not credible because the issue is not whether Clayton is competent in the sense of whether he can care for himself, or even whether Clayton suffers from deficits in comprehension, judgment, memory, or intelligence. The issue is whether Clayton can comprehend the reasons for his death sentence and its implications. *Panetti*, 551 U.S. at 957. Put another way, the issue is whether Clayton has a rational understanding of the punishment he is about to suffer and why he is to suffer it. *Id.* This is because the Eighth Amendment only prohibits Clayton's execution if he suffers from gross delusions that impair his "concept of reality [such] that he cannot reach a rational understanding of the reason for the execution." *Id.* at 958. Dr. Foster does not opine that Clayton suffers from the "gross delusions" of the sort described in *Panetti*. In fact, the only thing Dr. Foster says about Clayton's understanding of his impending execution is in the penultimate paragraph of his 2015 letter in which Dr. Foster asserts: "I do not find him competent to appreciate the purpose of his pending execution as addressed in *Panetti*[.]" Dr. Foster does not attempt to substantiate this assertion, and it is not supported by the remainder of his January 2015 letter.[2]

---

[2]  Regarding Dr. Foster's reliance on Dr. Preston's 2005 conclusions as to Clayton's inability to assist his counsel, Dr. Foster fails to note that the District Court specifically rejected those conclusions and found them to be inconsistent with the remainder of Dr. Preston's report.

### B.    Dr. Preston

Dr. Preston examined Clayton in 2005 at the request of the District Court in which Clayton's federal habeas petition was being heard.  As discussed above, the District Court thoroughly reviewed Dr. Preston's report and relied heavily upon it in reaching the conclusion that Clayton was competent to participate in federal habeas proceedings.  In so holding, the District Court reasoned that the standard for competence to proceed with habeas must require greater abilities than the minimal standard for competence to be executed.  Dr. Preston's report exhibits this same understanding because, even though Dr. Preston's ultimate opinion was that Clayton was not competent to proceed with his habeas petition, she had no doubt that Clayton was competent to be executed.

> 5) Does Mr. Clayton understand that he is to be executed and the reason for the execution (i.e., the killing of Officer Christopher Castetter)?
>
> Yes.  Mr. Clayton was fully aware of the fact that he had been convicted of murdering Officer Christopher Castetter.  Additionally, he expressed the understanding that he had been sentenced to death for this crime. According to Mr. Clayton, the method of execution for the state of Missouri is lethal injection.

Dr. Preston's report at p. 68.

Based on this conclusion, as well as the objective test results and subjective studies of Clayton described throughout Dr. Preston's report, the District Court rejected Clayton's claim that he was not competent to be executed.  The District Court denied a certificate of appealability on this claim, holding that no reasonable jurist could disagree about this conclusion.

This Court agrees. Though the District Court's decision that Clayton was competent to be executed in 2006 does not dispose of the question now before this Court, Dr. Preston's concessions and the other data in her 2005 report are still applicable and have been endorsed in the last two months by Dr. Foster and Dr. Logan. With no compelling evidence of any material change in his competence, this Court can reach no different conclusion from the one reached by the District Court in 2006.

## C.    Dr. Logan

Like Dr. Foster, Dr. Logan was brought in to render an opinion as to Clayton's competency to be executed in light of his execution date in 2008. Unlike Dr. Foster, however, Dr. Logan was not involved in Clayton's federal habeas or earlier state proceedings. After spending three and a half hours with Clayton and reviewing the voluminous mental health records amassed in earlier proceedings, Dr. Logan opined that Clayton was not competent to be executed. Like the other experts, however, the details of Dr. Logan's 2008 report do not support – and in some places contradict – this conclusion. In particular, he states:

> Mr. Clayton believes his conviction was the result of a conspiracy by the legal system against him and that someone else killed Deputy Castetter. Furthermore, despite knowing he is facing his last appeal, he firmly believes God will intervene and his execution will not occur…. While Mr. Clayton knows the State plans to execute him for killing Deputy Castetter, he believes his legal situation is instead a test of his faith and that God will not allow the punishment to occur as God has chosen him for another mission.

In 2013, Dr. Logan was asked to update his findings. He first summarized his findings from 2008, stating that Clayton "only knew concretely that the State planned to

23

execute him for killing Deputy Castetter, but belives [sic] this is only a test of his faith and would not occur." Because Clayton's "head trauma, documented on MRI, will never change," and because Clayton's delusional ideas are "fixed and unchangeable," Dr. Logan found "no reason to change my previous 2008 opinion[.]" He stated:

> When examined on September 14, 2012 Mr. Clayton's thoughts were tangential. He still believed God would intervene and he would one day be a gospel singer and evangelist. He continues to believe he was unjustly convicted and will never be executed. He just tries to get along with others and has asked God to work on his case. He does know his attorneys are working to get him off the capital punishment unit and then have a new trial. Past this point he has no understanding of the issues in his proceedings.

> On January 7, 2015, Dr. Foster again stated that "Mr. Clayton's mental state has

changed little since my earlier evaluations in 2008 and 2013."

> His view of his conviction is that he is the victim of a conspiracy. His mood varies from anxiety to paranoia. He still engages in delusional denial that his execution will take place relying on divine intervention in some form so he can pursue a gospel ministry as a preacher and sing with the best pianist in Missouri with whom he will tour the nation.

Even though he concludes that Clayton "lacks the capacity to understand matters in extenuation [or] arguments for executive clemency," Dr. Logan admits that, "[i]n this regard, he [Clayton] accepts that God may choose to work through his defense team[.]"

Dr. Logan's opinions about Clayton are not credible for the same reasons that the Court refused to credit the substantially similar opinions he offered in *Middleton III*. There, too, Dr. Logan opined that Middleton was incompetent to be executed because, even though "Middleton can recite the reason it [his death sentence] was imposed, he in fact believes his conviction was the result of a conspiracy.… Furthermore, he shows

24

little to no emotional reaction to his impending execution date but instead believes he will not die while incarcerated but will be cleared on the charges and return to the community." *Middleton III*, 435 S.W.3d at 84. Dr. Logan's opinions about Middleton, however, did not even purport to describe the sort of "gross delusions" that would prevent Middleton from "comprehending the meaning and purpose of the punishment to which he has been sentenced." *Id.* (quoting *Panetti*, 551 U.S. at 960). Accordingly, this Court held:

> Nothing in Dr. Logan's statement, or in the other proof submitted with Middleton's petition, even approaches a substantial threshold showing that Middleton suffers from such delusions. Instead, at most, they show that Middleton is delusional as to his innocence and his chances of escaping execution. Middleton plainly understands he is to be executed as punishment because he was found guilty of murdering his three victims; he simply believes he should not have been convicted. Nothing in *Panetti* or *Ford* suggests that an inmate is incompetent to be executed only if he both understands why he is being executed and agrees that the sentence is justified.

*Id*. at 85.

Even though Clayton has a severe brain injury and Middleton did not, Dr. Logan's assessment of the effects of Clayton's injury on his competence to be executed is fundamentally the same as his assessment of Middleton's competence to be executed. Dr. Logan concluded they were both incompetent because they both believed they were wrongfully convicted and they both believed their sentences would never be carried out. But being "delusional as to his innocence and his chance of escaping execution" did not mean that Middleton was incompetent to be executed. *Id*. Accordingly, those same

25

delusions do not constitute a sufficient threshold showing that Clayton is incompetent to be executed.

### D.    Other Evidence

The Court has reviewed the remaining evidence submitted in support of Clayton's petition, nearly all of which was reviewed by, described, and relied upon by one or more of Clayton's three experts (i.e., Drs. Foster, Logan and Preston).  None of this other evidence, either singly or in combination with the opinions of Clayton's experts, establishes the sort of threshold showing required by *Ford* and *Panetti*.  This evidence confirms the facts the experts describe, i.e., that Clayton continues to suffer effects from his 1972 brain injury but Clayton also understands that he was convicted of murdering Deputy Castetter and that he is to be executed for that crime.

For example, during telephone calls to his relatives, Clayton poignantly explains that his execution is being scheduled and that – unless that execution is stopped – he will die for murdering Deputy Castetter.  He explains that he will appear before a parole board as part of his clemency process and that he understands that the purpose of that appearance is to explain why he should not be executed.  Clayton then recites those circumstances surrounding the crime which he believes demonstrate his innocence.  Even though Clayton does not believe he is guilty, and even though he believes he will be spared execution, these calls confirm that Clayton knows – if he is not spared – that he is going to be executed for this murder.

In addition, in September 2014, at the request of the director of the department of corrections, the director of the department of mental health had James Reynolds, M.D., a

forensic psychiatrist, perform an evaluation of Clayton's competence to be executed. Dr. Reynolds' report confirms the Court's conclusions set forth above. For example, he concludes that "Mr. Clayton's religious beliefs, and his faith that God will intervene in some fashion to prevent his execution, do not represent delusional thinking." Respondent's Exhibit A at p. 9. Despite his beliefs, Dr. Reynolds explains that Clayton understands God may not spare him from execution, and Clayton is comfortable with that possibility. Clayton told Dr. Reynolds that, "if he [God] don't, it won't be his fault. I will take my chances with God." *Id.*

Dr. Reynolds also explains that, not only is Clayton aware of the implications his death sentence holds for him, Clayton has grown weary of the stress of waiting and not knowing. Viewed in that context, Dr. Reynolds concludes that Clayton has a realistic understanding that God may not spare him and, therefore, his faith that He can (and may) do so is not delusional.

> We were discussing the efforts of his attorneys to help him avoid the death penalty and the role that my evaluation and those of others might play in that process. Mr. Clayton stated "if it [my report] don't help me then it don't matter to me. I want an honest evaluation." He then added "it matters a lot to get off of capital punishment. I've had that hanging over my head for years. It would give me some relief in other words. It's been seventeen or eighteen years. You wouldn't want them to take a needle and put it in your arm and kill you, would you?" In my opinion, an individual who is delusional about the certainty of God rescuing him from the death penalty would not likely show so much feeling when discussing his fear of the sentence being executed.

*Id.* at 9-10.

Similarly, Dr. Reynolds recounts Clayton's description of the circumstances of Deputy Castetter's murder in 1996, as well as Clayton's explanation regarding those facts

27

which he believes demonstrate his innocence. In the end, however, Dr. Reynolds concluded: "Mr. Clayton's words to me in this area of discussion did not have the character of a delusional belief about his being falsely accused of the crime…. He merely claimed that he did not harm the deputy. Certainly it is not uncommon for criminal defendants to deny their guilt even in the face of overwhelming evidence. Such denial does not equate to delusional mental illness." *Id*. at 11.

Dr. Reynolds does not opine – and this Court does not believe – that Clayton is perfectly normal or that his 1972 brain injury does not affect him to this day. Clearly it does. Dr. Reynolds diagnosed Clayton as having several disorders in accordance with the Diagnostic and Statistical Manual of Mental Disorders, 4th edition ("DSM-IV"), including DSM 294.1 ("Dementia Due to General Medical Condition," i.e., traumatic brain injury, a small stroke, and possible age-related decline); DSM 296.32 ("Major depression – currently mild to low-moderate in severity"); DSM 293.82 ("Psychotic Disorder Due to General Medical Condition," i.e., traumatic brain injury). *Id*. at 8.

But, on the question of whether any single one, or a combination, of these mental diseases, "giv[es] reasonable cause to believe that Mr. Clayton is lacking in capacity to understand the nature and purpose of the punishment he is under sentence to receive," Dr. Reynolds responds: "It is my opinion, to a reasonable degree of medical certainty, that they do not." *Id*. at 10. He states unequivocally that Clayton "clearly is aware that he is under sentence of death for being convicted of shooting and killing Deputy Castetter. He indicated to me in what I consider an unequivocal fashion during the [initial] interview of June 26, 2014, that he understands that he is under the threat of

28

execution, that this will result in his death, and he communicated this to me with considerable feeling." *Id.* at 11.

E. **Matters in Extenuation and Clemency**

Clayton also claims that, even if he is competent to be executed under *Ford* and *Panetti*, he does not meet the standard for competence in section 552.060.1, RSMo 2000, which requires that he be able to understand "matters in extenuation, arguments for executive clemency or reasons why the sentence should not be carried out." The Court rejects this claim.

As described above, this Court found in *Clayton II* that there was no basis to suspect that Clayton was unable to assist counsel appropriately at (and prior to) his original trial. *Clayton II*, 63 S.W.3d at 209. During his federal habeas proceedings, the District Court found that Clayton was competent to assist counsel with those proceedings. *Competency Order* at 15-18. This finding was based on the extensive testing and evaluation by Dr. Preston, who found that Clayton's "cognitive deficits did not appear to negatively impact his ability to understand his legal proceedings." Dr. Preston's Report, at p. 30. The District Court relied extensively on Dr. Preston's conclusions that Clayton had "no significant impairment in memory" and could – with some work – communicate effectively with counsel. *Competency Order* at pp. 17, 15 (citing Dr. Preston's report at pp. 26-28).

Clayton provides no evidence that these capabilities have declined materially since 2006 and that, as a result of that decline, his counsel have been unable to prepare a clemency application on his behalf. As the District Court held, the question of whether

29

an inmate is competent to assist in his defense must be analyzed in light of the proceedings underway at the time and the demands those proceedings place on the inmate's memory and ability to communicate. *Competency Order*, at 13-15. Greatest prior to and during trial, these demands fall off markedly throughout the appellate, post-conviction, and federal habeas proceedings. At the end of this process, when the issue turns to clemency, there is very little that depends on the defendant suddenly recollecting some new fact that will result in a new argument or ground for clemency.

Certainly this is so in this case. Clayton's life has been chronicled exhaustively by counsel in the nearly two decades since his crime. Counsel have thoroughly mined the original trial for every conceivable legal and factual argument. As the petition in this case shows clearly, there is nothing about Clayton or this crime that has not been known and debated at multiple stages of his legal proceedings. And, as noted above, Clayton's telephone records and the evaluations of Drs. Foster, Logan and Reynolds show that Clayton recalls the salient details from 1996 quite clearly and is aware that both he and his counsel continue to search for arguments to preclude his execution.

Accordingly, even though the effects of his brain injury and increasing age make it more difficult for Clayton, there is no evidence that he is not capable of understanding "matters in extenuation, arguments for executive clemency or reasons why the sentence should not be carried out" as required by section 552.060.1 2000.

### F.    Clayton is Competent to be Executed

For the reasons set forth above, the Court finds that Clayton is competent to be executed. The Court has considered all of the evidence he has submitted and concludes

that this evidence – by itself and in light of the evidence submitted by the state – neither satisfies the threshold showing requirement in *Ford* and *Panetti* nor shows that Clayton is incapable of understanding arguments for extenuation or clemency as required by section 552.060.1, RSMo 2000.

## II.     Section 552.060.2 is Not Unconstitutional

Clayton claims that section 552.060.2, RSMo 2000, is unconstitutional "insofar as it permits the director of the Department of Corrections, a member of the executive branch who is charged with conducting the execution, to determine a prisoner's competence to be executed." This claim is denied on the merits.

Clayton misperceives the function of section 552.060.2. This subsection provides that, if the director of the department of corrections has reasonable cause to believe an inmate who is sentenced to death is not competent to be executed, "he shall immediately notify the governor who shall forthwith order a stay of execution of the sentence if there is not sufficient time between such notification and time of execution for a determination of the mental condition of such person to be made in accordance with the provisions of this section without such stay." By its plain language, this statute only pertains to what the director and the governor "shall" do under certain circumstances. It does not establish, define, or enforce any right belonging to the condemned inmate.

When this Court issues an execution warrant, the director and the warden of the particular institution are obligated to carry it out. Anytime the director has reasonable cause to believe that a condemned inmate is not competent to be executed, the director can – and indeed must – invoke the procedure in section 552.060.2. The fact that the

31

director does not need this statute to pursue the same course when no execution warrant is outstanding demonstrates that the purpose of section 552.060.2 focuses on when there is a warrant and the inmate, though incompetent to be executed, does not seek to protect himself. Without section 552.060.2, the director and the warden would be trapped between their duty to comply with the warrant by executing the prisoner and their independent constitutional duty not to execute an incompetent inmate. Section 552.060.2 resolves this dilemma and requires the governor to stay the execution.

Section 552.060.2 is irrelevant, however, when an inmate claims he is not competent to be executed. As this Court noted in *Middleton III*, a condemned inmate has a right to raise that issue directly in this Court by filing a petition for writ of habeas corpus. This is the procedure by which a condemned prisoner is permitted to litigate this question, and Clayton does not contend that it is constitutionally deficient to meet that end. Section 552.060.2, on the other hand, is only intended to be invoked by a different party under different circumstances. Accordingly, the Court now expressly holds what was implied in *Middleton III*, i.e., that section 552.060.2 is not unconstitutional because it does not permit the director to determine whether a prisoner is competent to be executed to the exclusion of (or even as a predicate to) an inmate's ability to seek a judicial determination on that issue.

## III. Clayton is not Intellectually Disabled under *Atkins*

Clayton's final claim is that, because of his significantly sub-average IQ and lack of adaptive skills, he is "intellectually disabled"[3] and, therefore, categorically ineligible for the death penalty under *Atkins*. As noted above, Clayton already has litigated this claim in his federal habeas proceedings. There, the District Court denied this claim and did not allow an appeal. *Clayton III*, 2006 WL 1128803, at *43 (noting that Clayton's expert, Dr. Back, testified that Clayton "was not retarded when she evaluated him in 2000").

Assuming (without deciding) that Clayton's lack of any intellectual disability is not res judicata based on the decision in the District Court, this Court rejects Clayton's claim on the merits. *Atkins* holds that the constitution prohibits the execution of an intellectually disabled person, but *Atkins* also recognizes that the question of what constitutes intellectual disability is a question of state law.[4] *Atkins*, 536 U.S. at 317. Missouri law on this issue is established by section 565.030.6, which provides:

> As used in this section, the terms "intellectual disability" or "intellectually disabled" refer to a condition involving substantial limitations in general functioning characterized by significantly subaverage intellectual functioning with continual extensive related deficits and limitations in two or more adaptive behaviors such as communication, self-care, home living, social skills, community use, self-direction, health and safety, functional

---

[3] Originally, the United States Supreme Court used the term "mentally retarded" to refer to persons with intellectual disability. In keeping with changes by the American Psychiatric Association and others, the Supreme Court now uses the phrase "intellectual disability" to describe the same condition. *See Hall v. Florida*, 134 S.Ct. 1986, 1989 (2014) (explaining the change in terminology).

[4] The Supreme Court, in *Hall*, recognizes, however, that the Court determines whether the state standard for "intellectual disability" meets constitutional scrutiny, after being informed by the medical community's diagnostic framework. *Hall*, 134 S.Ct. 1999-2000.

33

academics, leisure and work, which conditions are manifested and documented before eighteen years of age.

§ 565.030.6, RSMo Supp 2013.

The school records and other evidence provided by Clayton in this case show that he was of average intelligence – or better – before age 18, and this continued at least until his brain injury in 1972. Accordingly, he cannot be "intellectually disabled" as that term is defined in Missouri law.

Section 565.030.6, like the analysis *Atkins*, considers intellectual disability as an immutable characteristic which manifests at or shortly following birth and, therefore, is necessarily present at the time the defendant committed the crime. *Ford* and *Panetti*, on the other hand, analyze incompetence as a disease or defect which can arise after the crime and, therefore, must be evaluated separately at each stage of the proceedings. *See Ford*, 477 U.S. at 406-07 ("if, after judgment, he [the inmate] becomes of nonsane memory, execution shall be stayed"). *See also Goodwin*, 191 S.W.3d 20, 33 n.9 (Mo. banc 2006) (holding that, even though Goodwin was not intellectually disabled, he could still claim he is not competent to be executed when his execution date is set).

Clayton would eliminate this distinction by arguing that – even though his brain injury does not render him incompetent to be executed under section 552.060.1 or the Eighth Amendment standard under *Ford* and *Panetti* – the continuing effects[5] of that

_____

[5]   After his injury in 1972, Clayton's various "Full Scale IQ" scores are:  75 (in 1980, using the Wechsler Adult Intelligence Scale), 86 (in 1997, using the Wechsler Adult Intelligence Scale Revised), and 71 (in 2005, using the Wechsler Adult Intelligence Scale – Third Edition).  These scores all are in the "low average" range of intellectual functioning.  Clayton recognizes that these scores all are above the generally recognized cutoff for intellectual disability of 70, and

injury nevertheless exempt him from execution because they are "as if" he was intellectually disabled under *Atkins*. Clayton offers no authority for such an expansion of *Atkins*, and this Court is not persuaded that such an expansion is justified.

Accordingly, the Court finds that Clayton is not intellectually disabled under Missouri law and holds that – because *Atkins* does not apply to conditions not recognized as intellectual disabilities under state law – Clayton is not categorically excluded from eligibility for the death penalty. All conditions other than those which constitute an intellectual disability under section 565.030.6 must be analyzed in terms of their effect on an inmate's competence to be executed. As held above, Clayton fails to make a threshold showing that his lacks such competence.

### Conclusion

For the reasons set forth above, Clayton's petition for a writ of habeas corpus is denied on its merits and Clayton's accompanying motion for a stay of execution is overruled as moot.

_____
Paul C. Wilson, Judge

Russell, C.J., Breckenridge, and Fischer, JJ., concur; Stith, J., dissents in separate opinion filed; Draper and Teitelman, JJ., concur in opinion of Stith, J.

---

Clayton does not make a "margin of error" argument of the sort addressed in *Hall*, 134 S.Ct. at 2001. *See also Goodwin*, 191 S.W.2d at 31 n.7 (recognizing that IQ test scores are not applied mechanically because IQ scores are only one part of the statutory definition). Moreover, when Dr. Preston administered the competency assessment tests designed for use with intellectually disabled persons, Clayton's scores "were consistent with presumed competent individuals without mental retardation." Dr. Preston's report at p. 26.



# SUPREME COURT OF MISSOURI
## en banc

STATE EX REL. CECIL CLAYTON,    )
        )
        Petitioner,    )
        )
v.        )    No. SC94841
        )
CINDY GRIFFITH, in her capacity as    )
WARDEN, POTOSI CORRECTIONAL    )
CENTER,    )
        )
        Respondent.    )

## DISSENTING OPINION

Mr. Clayton has a traumatic brain injury that has resulted in the loss of 20 percent of his frontal lobe and has presented reasonable grounds to believe his overall mental condition has deteriorated and he is intellectually disabled under *Atkins v. Virginia, 536 U.S. 304, 317, 320 (2002)*, and *Hall v. Florida, 134 S.Ct. 1986, 2001 (2014)*. Mr. Clayton also has presented reasonable grounds to believe that he is incompetent to be executed and so, under *Ford v. Wainwright, 477 U.S. 339 (1986)*, and *Panetti v. Quarterman, 551 U.S. 930 (2007)*, is entitled to a hearing at which his competence will be determined. This Court, nonetheless, rushes to reject his request for a hearing before a special master at which he can attempt to prove his incompetency claim and his claim that he is intellectually disabled. As explained in more detail below, the majority's

decision to proceed with the execution at this time and in these circumstances violates the Eighth Amendment ban on cruel and unusual punishment.

### A.    *Timeliness of Petition for Habeas Relief*

The majority opinion suggests that one of the reasons why the Court refuses to allow him a hearing is that the request has come so close to the date of execution. But the *Ford* claim can be made only once an execution date is set, as it is the defendant's competency at the time of execution that is relevant. This Court set the execution date only on February 6, 2015. Counsel sought relief in federal court and then in this Court during the succeeding 33 days. Counsel can hardly be said to have tarried.

As to Mr. Clayton's claim that he is intellectually disabled, part of his claim is that his brain injury has combined with the lack of treatment while in prison to render him more disabled over time. As time goes on, therefore, his condition has deteriorated. He most recently was examined in January 2015. This Court did not give notice it would decide to start setting executions almost monthly. Counsel could not know which clients they needed to get examined first or whose execution would be set when. But counsel had acted before this Court notified Mr. Clayton on February 6, 2015, that he would be executed just 39 days later. If that execution proceeds as scheduled, it will be the 14th execution this State will have carried out since November 2013 – the Court set three other persons' executions, but those orders were later stayed by this Court or by the federal courts.

All of these executions have been carried out with less than 60-days' notice. The same group of half a dozen lead counsel, aided by fewer than a dozen co-counsel,

2

represent nearly all of those who have been executed, as well as others as to whom the attorney general of Missouri has filed motions to set execution dates. Recently, this Court has been asked to consider giving six-months' notice of execution dates because of the difficulties posed by the fact that the same small group of counsel represent nearly all of the death penalty petitioners, making it difficult for them to competently prepare pleadings or to recover from the death of one client, when they are unsuccessful, before turning to the next.

Ms. Carlyle, lead counsel for Mr. Clayton, has been lead counsel for three executed defendants in the last year alone – Michael Taylor, executed February 26, 2014; John C. Middleton, executed July 16, 2014; and Leon Taylor, executed just four months ago on November 19, 2014. Two of her other clients have received orders to show cause why execution dates should not be set. To suggest in these circumstances that these dedicated counsel are at fault for not filing papers a few weeks earlier is just plain unreasonable. It is also unreasonable to expect counsel to anticipate and have the ability to file pleadings and conduct needed medical and mitigation research and investigation simultaneously in the face of Missouri's sudden rush of executions.

I turn to a discussion of the substance of Mr. Clayton's claim.[1]

### B.    *Reasonable Grounds to believe Mr. Clayton is Intellectually Disabled*

In *Atkins* the United States Supreme Court held that no legitimate penological purpose is served by executing a person who is "mentally retarded."[2]  Therefore, *Atkins*

---

[1]  I do not respond to the majority's *sua sponte* decision to revisit Mr. Clayton's trial, appeal and earlier post-trial proceedings because the issues now raised by Mr. Clayton do not involve those proceedings.

3

held, to execute an intellectually disabled person would violate the Eighth Amendment. *536 U.S. at 317, 320.* *Atkins* left "to the States the task of developing appropriate ways to enforce the constitutional restriction." *Id. at 317.* But the constitutional restriction bars execution of the disabled; the constitutional protection is not narrowed just because some states may not enact a statute that encompasses all intellectually disabled persons.

Missouri, like other states, passed legislation to comply with *Atkins*' mandate. Missouri's statute bars the execution of persons with an "intellectual disability," which section 565.030.6, RSMo Supp. 2014, defines as:

> [A] condition involving substantial limitations in general functioning characterized by significantly subaverage intellectual functioning with continual extensive related deficits and limitations in two or more adaptive behaviors such as communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work, which conditions are manifested and documented before eighteen years of age.

Florida also passed legislation to comply with *Atkins*' mandate. Florida law defines intellectual disability as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18," and defines "significantly subaverage general intellectual functioning" as "performance that is two or more standard deviations from the mean score on a standardized intelligence test," with the mean IQ test score as 100. *Id. at 1994.*

---

[2] Being found "mentally retarded" now is referred to as being "intellectually disabled," and the latter term will be substituted for "mentally retarded" for the remainder of this opinion.

4

In *Hall*, Mr. Hall committed a murder in Florida for which he was subject to the death penalty. *134 S. Ct. at 1991*. But Mr. Hall claimed that he was ineligible for the death penalty because he was intellectually disabled. He had an IQ test score of 71. The question was whether this qualified him for a hearing as to whether he was intellectually disabled. The Florida Supreme Court interpreted the meaning of its statute narrowly. It held that a score of 70 was two standard deviations below a score of 100, and this made 70 a strict IQ cut-off. Therefore, Florida held, "a person whose test score is above 70, including a score within the margin for measurement error, does not have an intellectual disability and is barred from presenting other evidence that would show his faculties are limited." *Id. at 1994*. In fact, Florida held:

> Pursuant to this mandatory cutoff, sentencing courts cannot consider even substantial and weighty evidence of intellectual disability as measured and made manifest by the defendant's failure or inability to adapt to his social and cultural environment, including medical histories, behavioral records, school tests and reports, and testimony regarding past behavior and family circumstances. This is so even though the medical community accepts that all of this evidence can be probative of intellectual disability, including for individuals who have an IQ test score above 70.

*Id.*

The United States Supreme Court reversed and remanded. *Id. at 2001*. In doing so, the Supreme Court explained that the Florida Supreme Court disregarded established medical practice in two ways. *Id. at 1995*. First, the Florida Supreme Court took "an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence." *Id.* This was error. In determining whether an individual is intellectually disabled, the Supreme Court stated, other factors regarding an individual's adaptive functioning must be considered in addition to IQ, such

5

as evidence of past performance, environment, and upbringing. *Id. at 1995-96.* Therefore, "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Id. at 2001.*

Second, and interrelated with the first reason, the Florida Supreme Court relied "on a purportedly scientific measurement of the defendant's abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise." *Id. at 1995.* The Supreme Court said that many medical professionals agree that an IQ score should be considered a range rather than a fixed score, and such a range reflects the "standard error of measurement." *Id.* Although Hall's score was 71, the margin of error meant his score fell in a range between 66 and 76, creating the possibility that the defendant's actual IQ was below 70. *Id.* But the Florida Supreme Court "used the test score as a fixed number, thus barring further consideration of other evidence bearing on the question of intellectual disability." *Id. at 1996.* *Hall* held this was improper, and the Supreme Court remanded for a factual determination as to whether Mr. Hall was competent.

Here, as in *Hall,* Cecil Clayton most recently has posted an IQ score of 71. The majority does not deny that if Clayton had a score of 66, or some other score below 70, he would be entitled to a hearing as to his intellectual disability. But, because his score is 71, it says he does not. This is **exactly what the Supreme Court in *Hall* disallowed**!

The majority tries to get around this issue by saying in a footnote that the "margin of error" argument was not raised. It is not clear why the majority would want to execute

6

an intellectually disabled man regardless of whether the claim was preserved. To do so would be manifestly unjust.

In any event, the issue is not one that is waivable for multiple reasons. First, it is not an error that must be raised to be preserved. It is just a scientific fact, a definition, of what is meant by a score of 70 – it means a range with 70 at its center. Margins of error are inherent in the testing, not a legal issue to be preserved. That is what *Hall* was all about.

Second, if Mr. Clayton is intellectually disabled, then the Eighth Amendment makes him ineligible for execution. Would the majority hold that if a 14-year-old had failed to raise his age at trial or in post-trial proceedings then it would be permissible to execute him for a crime he committed while he was a minor? Of course not; his age would make him ineligible for execution. So too, here, if Mr. Clayton is intellectually disabled, then he is ineligible for execution. *Hall* held that: "The death penalty is the gravest sentence our society may impose. Persons facing that most severe sanction must have a fair opportunity to show that the Constitution prohibits their execution." *Hall, 134 S. Ct. at 2001* (emphasis added). Mr. Clayton deserves a hearing here.

The majority also suggests that Mr. Clayton does not need a hearing, despite *Hall,* because Mr. Clayton presented evidence of his lack of competency at trial and it was rejected. But the issue here is not whether Mr. Clayton was sufficiently competent to assist in his defense or to be found guilty when he was convicted in 1996. The issue is whether Mr. Clayton is sufficiently competent *today* to be executed. Mr. Clayton alleges that his lack of treatment during his incarceration has worsened his condition. His 2004

7

IQ score of 71 has never been seen by a jury or considered by a Missouri court in an evidentiary hearing, and neither have the expert opinions given since his post-conviction hearing, opinions that support a finding of intellectual disability. Mr. Clayton's score of 71 is within the standard error of measurement and *Hall* constitutionally requires that he be given a hearing to present evidence of impairments in both his intellectual and adaptive functioning.

The majority further suggests that if intellectual disability is an issue it must reach, it factually finds, from its own review of the record, that Mr. Clayton is not intellectually disabled and, therefore, will not give him a hearing. But that puts the cart before the horse. He needs to have the hearing before the Court can reject (or, there is always the possibility that the majority would accept) the evidence he presents at it. Mr. Clayton having shown he has an IQ score of 71, within the range of a score that is below 70, is entitled to a hearing at which he has opportunity to prove that intellectual disability before a fact-finding body, which this Court is not, at which he is entitled to present "other factors regarding an individual's adaptive functioning that must be considered in addition to IQ, such as evidence of past performance, environment, and upbringing." *Hall, 134 S. Ct. at 1995-96.*

The majority finally suggests that a *Hall* hearing need not be held because it is not mandated by Missouri's statute, section 565.030.6, which defines "intellectual disability" as a disability that manifests itself before the age of 18. But Mr. Clayton's principal claim is not that he is entitled not to be executed under section 565.030.6. His claim is that he is entitled to relief under the Eighth Amendment as interpreted and applied in

8

*Atkins* and *Hall*. Section 565.030.6 simply sets out the circumstances in which the legislature determined that a person is intellectually disabled. The legislature did not state that no one can become intellectually disabled after age 18, for to do so would be absurd. Of course people can become disabled later in life. In any event, the presumptive purpose of requiring a disability to manifest itself by age 18 is to preclude later faking of intellectual disability. Here, there is no factual dispute that Clayton suffered a brain injury and lost 20 percent of his frontal lobe, and that his IQ went down thereafter and long prior to the murder, so those concerns are not present.

Whatever section 565.060 says, it is axiomatic that the Eighth Amendment applies to all persons, so that under it a person who becomes intellectually disabled after age 18 may also seek relief from execution. Indeed, while, as the majority notes, *Atkins* left "to the States the task of developing appropriate ways to enforce the constitutional restriction," *536 U.S.at 317*, *Hall* makes it clear that what is "appropriate" is limited by the Eighth Amendment. This is because the *Atkins* mandate that it is unconstitutional to execute someone who is intellectually disabled *does not* depend on *when* an intellectual disability manifested, but on *whether* an intellectual disability exists. It is not merely a statutory right and in fact this Court by rule barred the execution of individuals with intellectual disabilities before the statute was adopted. The right of an intellectually disabled person not to be executed is a human right protected by the Eighth Amendment.

Mr. Clayton is entitled to a hearing before a master on his claim of intellectual disability.

9

### C. *Mr. Clayton is Entitled to a Hearing under* **Ford v. Wainwright.**

Clayton also invokes his right to a competency hearing prior to his execution under *Ford* and *Panetti*. Indeed, the majority acknowledges that *Ford* requires a competency hearing when the defendant makes a showing that he does not understand the reason for his execution. But, it says, that is the only circumstance in which *Ford* or *Panetti* require a competency hearing. The majority opinion is wrong.

In *Panetti*, the Supreme Court explicitly held that merely being aware of the rationale for the execution – a murder – is not adequate to meet the required standard of competency, the prisoner must also understand the rationale for his execution. As *Panetti* stated:

> We … find no support … in *Ford*, including in its discussions of the common law and the state standards, for the proposition that a prisoner is automatically foreclosed from demonstrating incompetency once a court has found he can identify the stated reason for his execution. *A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it. Ford does not foreclose inquiry into the latter.*

*Panetti, 551 U.S. at 959* (emphasis added).

Further, Missouri has enacted a statute that spells out in greater detail what the *Ford* inquiry requires. Section 552.060.1 states: "No person condemned to death shall be executed if as a result of mental disease or defect he lacks capacity to *understand the nature and purpose of the punishment about to be imposed upon him or matters in extenuation, arguments for executive clemency or reasons why the sentence should not be carried out.*" (Emphasis added).

The majority simply ignores the requirement that, unless Mr. Clayton understands the rationale for his execution and matters "in extenuation, arguments for executive

10

clemency or reasons why the sentence should not be carried out," then he is not competent to be executed. But shutting its eyes to this requirement does not make it go away.

The majority is also incorrect in suggesting that this Court can now decide on the present record whether Mr. Clayton is competent and as it finds he is, he does not need a hearing. That, again, puts the cart before the horse. The only issue for this Court is whether Mr. Clayton has presented reasonable grounds that, if believed, demonstrate he lacks the competency to be executed. If so, then this Court must allow a hearing at which a factual determination can be made. No such hearing has been held in a Missouri court. The record before this Court presents reasonable grounds to believe that Mr. Clayton can meet the *Panetti* or section 552.060.1 standard. As Dr. Logan noted after his examination of Mr. Clayton in January of this year:

> Mr. Clayton due to his delusional denial, lacks the capacity to understand matters in extenuation, arguments for executive clemency or any reasons his attorneys might present as to why his sentence should not be carried out.

Another report states:

> While Mr. Clayton knows the State plans to execute him for killing Deputy Castetter, he believes his legal situation is instead a test of his faith and that God will not allow the punishment to occur as God has chosen him for another mission. Hence, he has no concept of a need for clemency, or capacity to understand matters in extenuation, arguments for executive clemency or rational reasons why the sentence should not be carried out.

And Dr. Foster, whose testimony the majority much discusses, states that Mr. Clayton:

> … remains, as he has been since I first met him, unable to fully participate, cooperate or comprehend his legal status, process and final, pending deliberations. While he can superficially seem intact, extended contact or

11

observation exposes his multiple deficits, which continue their slow deterioration, despite the structured, secure setting in which he has resided over the past two decades. He is not simply incompetent legally, he would be unable to care for himself or manage basic self care, were he not in a structured environment that takes care of him. He can shower, groom, eat, walk, it is his comprehension, judgment, memory, limited intelligence and social deficits that plague him.

I do not find him competent to appreciate the purpose of his pending execution as addressed in *Panetti v. Quarterman* and *Ford v.Wainwright*, should it not be stayed by the State of Missouri or the Federal Court. He can replicate elements of the fact that an execution follows a conviction for first degree murder, though still does not comprehend, appreciate nor understand its approaching date for him.

The special master may or may not believe these experts, or Mr. Clayton's other evidence and experts, but Dr. Foster's expert opinion, particularly as supported by Mr. Clayton's 2004 IQ score of 71, presents reasonable grounds for a hearing. Mr. Clayton should be allowed the opportunity to convince the special master that he is ineligible for execution because he is intellectually disabled or because he does not have a rational understanding of the reasons for his execution and does not have the capacity to understand matters in extenuation, arguments for executive clemency or rational reasons why the sentence should not be carried out. The denial of such a hearing deprives Mr. Clayton of a fair opportunity to show that the Constitution prohibits his execution.

For the foregoing reasons, I dissent.


_____
*LAURA DENVIR STITH, JUDGE*